# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

(Greenbelt Division)

| | |
|---|---|
| **DR. NICHOLAS LAILAS, M.D.,** Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>**DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, d/b/a DC WATER,**<br><br>    Defendant. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.     Plaintiff Dr. Nicholas Lailas, M.D. ("Plaintiff" or "Dr. Lailas"), individually and on behalf of all others similarly situated, brings this class action against Defendant District of Columbia Water and Sewer Authority, doing business as DC Water ("DC Water" or "Defendant"), for damages arising from the January 19, 2026 collapse of a major sanitary sewer line known as the Potomac Interceptor and the resulting discharge of untreated wastewater into the Potomac River in Maryland. As of February 6, 2026, DC Water publicly estimated that approximately 243 million gallons of wastewater overflowed from the collapse site, with approximately 194 million gallons occurring within the first five days before bypass pumping operations significantly reduced

overflows. Plaintiff asserts claims for negligence, private nuisance, public nuisance, and trespass under Maryland law, and seeks compensatory and injunctive relief on behalf of himself and all similarly situated persons whose property interests in and use and enjoyment of the Potomac River, its tributaries, and adjacent properties have been impaired by Defendant's conduct.[1]

2.      DC Water owns, operates, and maintains the Potomac Interceptor ("PI"), which DC Water describes as a regional sanitary sewer system conveying on the order of 60 million gallons of wastewater per day from service areas in Fairfax County and Loudoun County, Virginia, and Montgomery County, Maryland, to DC Water's Blue Plains Advanced Wastewater Treatment Plant in Washington, D.C. On January 19, 2026, a 72-inch diameter section of the PI collapsed along the Clara Barton Parkway near the Interstate 495 interchange in Montgomery County, Maryland, within the Chesapeake and Ohio Canal National Historical Park near Lock 10. The collapse caused massive volumes of raw, untreated sewage to overflow directly into the Potomac River.[2]

3.      DC Water has publicly acknowledged that, between 2011 and 2015, it inspected the Potomac Interceptor and that the inspected pipe segments indicated "the majority of the pipe segments show signs of corrosion." The PI corridor where the collapse occurred had been under active rehabilitation since September 2025 as part of a rehabilitation project on an approximately 800-foot segment near I-495, but the specific section that collapsed had not yet been rehabilitated. Despite this documented knowledge of system-wide corrosion, DC Water failed to implement

---

[1] DC Water, "Key Findings on Extent of Sewer Overflow and Potomac River Impact" (Feb. 6, 2026), available at https://www.dcwater.com/about-dc-water/media/news/dc-water-releases-key-findings-extent-sewer-overflow-and-potomac-river.
[2] DC Water, "Potomac Interceptor," available at https://www.dcwater.com/about-dc-water/what-we-do/wastewater-collection/potomac-interceptor.

adequate interim safeguards, emergency preparedness plans, or monitoring protocols to prevent or contain a catastrophic failure in the highest-risk unremediated sections of the system.[3]

4.    Plaintiff does not allege that DC Water was required to rehabilitate all aging infrastructure simultaneously. Rather, having elected to continue operating unrepaired segments within a known high-risk corridor, DC Water was required to implement reasonable interim operational safeguards to manage the foreseeable risk of failure.

5.    Independent monitoring by the Potomac Riverkeeper Network and the University of Maryland reported *E. coli* concentrations at the outflow near Lock 10 exceeding 4,000,000 MPN/100 mL—levels orders of magnitude above the 410 MPN/100 mL primary-contact threshold used by Virginia, Maryland, and District of Columbia agencies and consistent with EPA-referenced recreational water quality criteria. Subsequent agency monitoring reported downstream levels frequently below that threshold at certain locations from approximately February 1, 2026 onward, but multiple jurisdictions issued and maintained public health advisories warning against all water-contact activities in the affected reach.

6.    Plaintiff and Class Members have suffered and continue to suffer concrete, measurable injury as a direct and proximate result of Defendant's tortious conduct, including physical contamination of vessels and riparian property, out-of-pocket costs for inspection, cleaning, and decontamination, loss of use and access to contaminated waterways, diminished property values, and business interruption losses suffered by marinas, boathouses, outfitters, and other enterprises dependent on river access.[4] Plaintiff brings this case individually and on behalf of a class of similarly situated persons, as more fully defined herein, and asserts claims for

---

[3] DC Water, "Potomac Interceptor," *supra* note 2 ("the majority of the pipe segments show signs of corrosion, and some show settled deposits").
[4] Potomac Riverkeeper Network, "DC Sewer Spill Monitoring" (Jan. 28, 2026 sampling results), available at https://potomacriverkeepernetwork.org/press-release-dc-sewer-spill-monitoring/.

negligence, private nuisance, public nuisance, and trespass under Maryland law. Plaintiff further reserves the right to amend this Complaint to add claims under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, upon expiration of the statutory 60-day notice period. The claims asserted herein challenge only DC Water's operational failures — its failure, having chosen to continue operating known high-risk pipe segments while awaiting rehabilitation, to implement reasonable interim safeguards including enhanced monitoring, emergency preparedness, flow management, and containment measures to manage the foreseeable risk of catastrophic failure — and do not challenge DC Water's discretionary policy judgments regarding capital budgeting, rehabilitation sequencing, or resource allocation.

## PARTIES

7.      Plaintiff Dr. Nicholas Lailas, M.D. is a citizen of the Commonwealth of Virginia, residing at 10120 High Hill Ct., Great Falls, Virginia 22066. Dr. Lailas owns and maintains an approximately 45-foot vessel moored at Columbia Island Marina, a National Park Service facility located on Columbia Island within the George Washington Memorial Parkway, situated on the Pentagon Lagoon of the Potomac River downstream of the PI collapse site. Dr. Lailas regularly uses his vessel to recreate on the Potomac River for pleasure, including in areas downstream of and adjacent to the collapse site. As with most inboard-powered vessels, Dr. Lailas's boat draws in surrounding river water through its raw water intake system for engine cooling, air conditioning, and other onboard systems. Since January 19, 2026, the discharge of untreated sewage into the Potomac River has directly contaminated the waters in which Dr. Lailas's vessel is moored, impairing his use and enjoyment of the vessel and the surrounding waterway for navigation, recreation, and daily living. Dr. Lailas has incurred specific out-of-pocket costs for vessel cleaning and decontamination, has been deprived of use of his vessel, and has suffered physical

contamination of his property. Dr. Lailas has suffered, and continues to suffer, injury in fact that is fairly traceable to Defendant's conduct and redressable by this Court.

8.    Defendant District of Columbia Water and Sewer Authority is an independent authority of the District of Columbia government, established pursuant to D.C. Law 11-111 (the Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996), codified at D.C. Code § 34-2202.02. DC Water is "a corporate body" with "a separate legal existence within the District government." D.C. Code § 34-2202.02(a). DC Water's general purpose is to "plan, design, construct, operate, maintain, regulate, finance, repair, modernize, and improve water distribution and sewage collection, treatment, and disposal systems." D.C. Code § 34-2202.02(c). DC Water owns and operates the Potomac Interceptor and the Blue Plains Advanced Wastewater Treatment Plant. DC Water holds NPDES Permit No. DC0021199 issued by EPA pursuant to 33 U.S.C. § 1342, which EPA has administratively extended under 40 C.F.R. § 122.6. DC Water's principal office is located at 1385 Canal Street, SE, Washington, DC 20003.

## JURISDICTION AND VENUE

9.    This Court has original jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties. Plaintiff is a citizen of Virginia. Defendant DC Water is an independent authority and instrumentality of the District of Columbia government created pursuant to D.C. Code § 34-2202.02. DC Water is a "corporate body" with "a separate legal existence within the District government." D.C. Code § 34-2202.02(a). For purposes of diversity jurisdiction, federally created or congressionally authorized municipal corporations and public authorities are citizens of the state or District under whose laws they are organized. *See, e.g.*, *Moor v. Alameda*

*County*, 411 U.S. 693, 717–18 (1973). DC Water is therefore a citizen of the District of Columbia for purposes of 28 U.S.C. § 1332(a).

10.     Separately, and in addition to diversity jurisdiction, this Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because there are 100 or more putative class members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and one or more members of the putative class is a citizen of a state different from Defendant.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Montgomery County, Maryland, which lies within this judicial district, and because the property that is the subject of this action—the Potomac Interceptor and the affected waters of the Potomac River—is situated in this District.

## GENERAL FACTUAL ALLEGATIONS

### A. The Potomac Interceptor

12.     DC Water owns, operates, and maintains the Potomac Interceptor, which DC Water describes as a regional sanitary sewer system conveying on the order of 60 million gallons per day of raw wastewater from service areas in Fairfax County and Loudoun County, Virginia, and Montgomery County, Maryland, to DC Water's Blue Plains Advanced Wastewater Treatment Plant in Southwest Washington, D.C.[5]

13.     The PI was constructed in the 1960s pursuant to Public Law 86-515 (74 Stat. 210, June 12, 1960), which authorized the District of Columbia to plan, construct, operate, and maintain the sewer line. *See* D.C. Code §§ 34-2131 through 34-2134.

---

[5] DC Water, "Potomac Interceptor," *supra* note 2.

14.     The PI is a gravity-fed system consisting primarily of 72-inch and 54-inch diameter reinforced concrete pipe. Significant portions of the PI traverse lands administered by the National Park Service, U.S. Department of the Interior, under a right-of-way permitting framework. Under current NPS right-of-way regulations, a permittee accepting a right-of-way permit agrees to specified terms and conditions, including responsibility for damage to United States property and an indemnification obligation for liability arising from operation and maintenance, subject to legal limitations applicable to governmental permittees. 36 C.F.R. § 14.10(c)(3).

**B. DC Water's Prior Knowledge of Infrastructure Deterioration**

15.     DC Water had extensive, actual, and documented knowledge of the deteriorated condition of the Potomac Interceptor for over a decade prior to the January 19, 2026 collapse.

16.     Between 2011 and 2015, DC Water conducted a comprehensive inspection of the PI. DC Water has publicly stated that the inspection revealed that "the majority of the pipe segments show signs of corrosion, and some show settled deposits."[6]

17.     In response to the inspection findings, DC Water initiated a $625 million, 10-year capital improvement program to rehabilitate the PI's most vulnerable sections, as part of its broader $10 billion Capital Improvement Program. The magnitude of this program demonstrates DC Water's own assessment of the severity of the system's deterioration.[7]

18.     According to DC Water's public project announcement, Fort Myer Construction Corp. began performing an approximately $9.6 million rehabilitation project using sliplining methods on an approximately 800-foot segment of the PI near I-495 on September 8, 2025, with work expected to continue through April 2026. The collapse occurred approximately one-quarter

---

[6] DC Water, "Potomac Interceptor," *supra* note 2.
[7] David L. Gadis, CEO & General Manager, DC Water, "An Open Letter from DC Water CEO David L. Gadis about the Potomac Interceptor" (Feb. 11, 2026), available at https://www.dcwater.com/about-dc-water/media/news/open-letter-dc-water-ceo-david-l-gadis-about-potomac-interceptor.

mile from this active work site. The proximity of the collapse site to a segment being actively rehabilitated supports a reasonable inference that DC Water recognized heightened structural risk throughout this corridor, though Plaintiff does not allege that the collapsed segment was within the scope of the September 2025 project absent further discovery.[8]

19.      The initiation of active rehabilitation within the immediate vicinity of the collapse site reflects DC Water's determination that this corridor presented heightened structural risk relative to other portions of the Potomac Interceptor. Despite recognizing the need for rehabilitation in this area, DC Water continued operating adjacent unrepaired segments at full capacity without enhanced monitoring, interim reinforcement, or pre-staged failure-response measures. On information and belief, when DC Water and its contractor performed the September 2025 rehabilitation of the adjacent upstream segment, DC Water did not conduct a contemporaneous condition assessment of the pipe section immediately downstream — the section that collapsed on January 19, 2026. On further information and belief, DC Water did not install interim monitoring equipment on, or develop a contingency or emergency response plan specific to, the unremediated downstream section during the period in which it remained in active service at full capacity while the adjacent segment was taken offline for rehabilitation. DC Water's engineers and contractors were physically present in the immediate vicinity of the section that would fail four months later, performing work on the same pipeline prompted by the same

---

[8] DC Water, "DC Water Begins Construction to Rehabilitate Sewer Line Along Clara Barton Parkway" (Sept. 8, 2025), available at https://www.dcwater.com/projects/dc-water-begins-construction-rehabilitate-sewer-line-along-clara-barton-parkway; *see also* Debra K. Rubin, "DC Utility Pushes to Remediate Up to 300M-Gal Potomac River Sewage Spill," Eng'g News-Record (Feb. 3, 2026), available at https://www.enr.com/articles/62449-dc-utility-pushes-to-remediate-up-to-300m-gal-potomac-river-sewage-spill (reporting that the collapse occurred approximately one-quarter mile from where Fort Myer Construction Corp. had been working since the prior fall on an eight-month, $9.6-million rehabilitation project using sliplining methods on an 800-foot segment); Martin Austermuhle, "What You Need to Know About the Big Sewage Spill in the Potomac," The 51st (Jan. 29, 2026), available at https://51st.news/potomac-sewage-spill-faq-dc/.

corrosion findings, yet took no documented steps to assess or safeguard the adjacent unremediated section.

20.     The pipe section that collapsed had not yet undergone rehabilitation despite DC Water's multi-year corrosion mitigation program and remained in active service while the adjacent upstream segment was being repaired.

21.     On information and belief, DC Water's 2011–2015 inspection data for the specific pipe section that collapsed on January 19, 2026, revealed corrosion or deterioration consistent with the system-wide findings described above, and DC Water's rehabilitation prioritization methodology identified this section as requiring rehabilitation within the scope of the $625 million capital improvement program. The fact that this section had not yet been rehabilitated at the time of the collapse does not indicate that DC Water assessed it as low-risk; rather, it indicates that DC Water had not yet reached this section in its rehabilitation sequence — a sequence that, by DC Water's own account, required a decade and $625 million to complete precisely because of the scope of the system's deterioration.

22.     DC Water entered into federal consent decrees with the U.S. Department of Justice and the Environmental Protection Agency regarding Clean Water Act violations in 2004, which were amended in 2015 to extend the compliance timeline to 2030. These consent decrees addressed, among other things, operation and maintenance obligations in DC Water's sewer system.[9]

---

[9] EPA, "District of Columbia Water and Sewer Authority, District of Columbia Clean Water Settlement," available at https://www.epa.gov/enforcement/district-columbia-water-and-sewer-authority-district-columbia-clean-water-settlement; U.S. Dep't of Justice, Press Release (Dec. 2004), available at https://www.justice.gov/archive/opa/pr/2004/December/04_enrd_793.htm; First Amendment to Consent Decree (2015), available at https://www.epa.gov/enforcement/first-amendment-district-columbia-water-and-sewer-consent-decree.

23.     The EPA's 2022 Infrastructure Needs Survey estimated that the District of Columbia needs approximately $1.33 billion to replace or rehabilitate structurally deteriorating sewer infrastructure within 20 years.[10]

24.     A 2023 industry publication by Access Water specifically addressed DC Water's "Potomac Interceptor Long-term Corrosion Prevention Program." A vendor case study by Sprayroq described the PI as having "significant deterioration and inefficiency, posing a risk to the environment and the surrounding community's health."[11]

**C. The Collapse and Sewage Overflow**

25.     On or about January 19, 2026, a 72-inch diameter section of the PI collapsed at a location along the Clara Barton Parkway near the Interstate 495 interchange in Montgomery County, Maryland, within the C&O Canal National Historical Park near Lock 10. The collapse caused massive volumes of raw, untreated sewage to overflow from the PI into a creek bed adjacent to the collapse site, which then discharged directly into the Potomac River.

26.     The overflow was not contained for approximately five days following the initial collapse. DC Water's February 6, 2026 "Key Findings" report estimates that approximately 194 million gallons of raw, untreated sewage flowed uncontrolled into the Potomac River during this period, before bypass pumping significantly reduced overflows.[12]

27.     On or about January 24, 2026, DC Water activated a temporary bypass pumping system, utilizing six high-capacity industrial pumps, each capable of moving approximately 7

---

[10] WTOP News (citing EPA 2022 Infrastructure Needs Survey), available at
https://wtop.com/local/2026/01/massive-sewer-spill-flowing-into-potomac-river-upstream-from-washington/.
[11] Access Water (2023), "Potomac Interceptor Long-term Corrosion Prevention Program—DC Water Using Innovative Tools to Support Strategy Development," available at
https://www.accesswater.org/publications/proceedings/-100977/potomac-interceptor-long-term-corrosion-prevention-program-dc-water-using-innovative-tools-to-support-strategy-development; Sprayroq, "Potomac Interceptor" (case study), available at https://sprayroq.com/case-study/potomac-interceptor/.
[12] DC Water, Key Findings, *supra* note 1.

MGD, to divert wastewater into an isolated section of the C&O Canal and back into the PI downstream of the collapse. To implement the bypass, DC Water, in coordination with the National Park Service, removed the upper lock gates on C&O Canal Locks 11, 12, 13, and 14, using approximately 2,700 feet of the historic Canal as a temporary wastewater conveyance.

28.     Even after bypass activation, overflow events have continued. On February 9, 2026, approximately 600,000 gallons of additional sewage overflowed when bypass pumps became clogged with non-dispersible wipes. DC Water has acknowledged "residual risk of additional limited overflows."[13]

29.     As of February 6, 2026, DC Water's flow monitoring estimates that a total of approximately 243 million gallons of untreated sewage were discharged into the Potomac River as a result of the collapse. Independent estimates from the Potomac Riverkeeper Network place the figure at approximately 300 million gallons. Additional overflow events have occurred since that date, and the total volume of discharge may continue to increase.[14]

30.     As of the date of this filing, the PI has not been fully repaired. A large rock blockage extends approximately 30 feet downstream of the original failure point, complicating repair efforts. DC Water announced on March 3, 2026 that emergency repair work is set to begin, with full repair and longer-term rehabilitation of the more than 60-year-old pipe expected to take up to nine to ten months.[15]

---

[13] DC Water, "Update on Potomac Interceptor Overflow Repair" (Feb. 8, 2026), available at https://www.dcwater.com/about-dc-water/media/news/update-potomac-interceptor-overflow-repair-february-8-2026.
[14] DC Water, Key Findings, *supra* note 1 (243 million gallons); Southern Maryland Chronicle (Feb. 9, 2026), available at https://southernmarylandchronicle.com/2026/02/09/riverkeeper-potomac-still-unsafe-amid-massive-dc-sewer-spill/ (Riverkeeper estimate of approximately 300 million gallons).
[15] DC Water, *Emergency Repair Work Set to Begin on Potomac Interceptor* (Mar. 3, 2026), available at https://www.dcwater.com/about-dc-water/media/potomac-interceptor-collapse/potomac-interceptor-updates; Gadis, Open Letter, *supra* note 7 ("more than 60 years old").

**D. Environmental and Public Health Impact**

31.     *E. coli* levels at the Lock 10 effluent point were measured by the Potomac Riverkeeper Network and the University of Maryland in the days following the collapse. Testing reported concentrations exceeding 4,000,000 MPN/100 mL—levels that the Potomac Riverkeeper Network described as approximately 11,900 times the 410 MPN/100 mL primary-contact threshold used by Virginia and Maryland agencies and referenced in EPA's 2012 Recreational Water Quality Criteria as a statistical threshold value ("STV") for culturable *E. coli*. Conditions varied by date, sampling location, and agency. DC Water's February 6, 2026 Key Findings stated that, since approximately February 1, 2026, downstream *E. coli* levels at certain monitoring locations had been within EPA's acceptable range for primary-contact recreational activities, apart from a single-day exceedance at Fletcher's Boathouse.[16]

32.     Contamination from the discharge extended approximately 10 miles downstream to Thompson Boat Center along the D.C. waterfront, encompassing Columbia Island Marina where Plaintiff's vessel is moored.[17]

33.     Montgomery County, the Commonwealth of Virginia, and the District of Columbia each issued public health advisories warning residents and recreational users to avoid all contact with the Potomac River and its shorelines in the affected area. The DC Department of Energy and Environment recommended continued precautions due to uncertainty and evolving conditions.[18]

---

[16] Potomac Riverkeeper Network, *supra* note 4; DC Water, Key Findings, *supra* note 1.

[17] Potomac Riverkeeper Network, *supra* note 4 ("High E. coli contamination continued all the way down to Thompson Boat House along the DC waterfront, about 10 miles downstream"); DC Water, Key Findings, *supra* note 1 (listing Thompson Boat Center as a DC Water sampling location with confirmed contamination).

[18] WTOP News, "Virginia Health Officials Warn To Avoid Contact with Potomac River Due to Sewage Spill" (Feb. 14, 2026), available at https://wtop.com/virginia/2026/02/virginia-health-officials-warn-to-avoid-contact-with-potomac-river-due-to-sewage-spill/; DC Dep't of Energy & Env't, "Potomac Interceptor Update and FAQs," available at https://doee.dc.gov/release/potomac-interceptor-update-and-faqs.

34.    Fletcher's Boathouse, a key recreational access point on the Potomac River, showed intermittently elevated *E. coli* levels and was forced to curtail or suspend operations.[19]

**E. DC Water's Failure to Implement Adequate Safeguards**

35.    Despite over a decade of actual knowledge that the PI was deteriorating, DC Water failed to implement reasonable interim measures to manage the risk of a catastrophic failure while rehabilitation was pending. A reasonably prudent utility operator, knowing what DC Water knew, would have implemented some or all of the following measures:

a.    **Enhanced monitoring:** Increased inspection frequency for the highest-risk, not-yet-rehabilitated segments of the PI, particularly those adjacent to environmentally sensitive resources such as the Potomac River. Upon information and belief, DC Water failed to conduct structural integrity assessments of the collapsed section beyond its 2011–2015 baseline inspection and failed to deploy real-time condition monitoring.

b.    **Flow management:** Temporary flow diversion or load reduction protocols to decrease hydraulic stress on the most vulnerable segments during periods of high flow or adverse conditions. Upon information and belief, no temporary load-reduction or diversion protocols were implemented for the unrepaired segment prior to failure.

c.    **Emergency preparedness:** Pre-positioned emergency bypass equipment, pre-negotiated contractor capacity, and rehearsed emergency response plans calibrated to the specific, foreseeable scenario of a large-diameter pipe failure in the C&O Canal corridor. The fact that it took five days to activate a bypass—during which approximately 194 million gallons of raw sewage entered the Potomac River—demonstrates that bypass capacity was not pre-deployed or immediately operational at the time of collapse.

---

[19] DC Water, Key Findings, *supra* note 1.

d.    **Interim structural reinforcement:** Temporary liner installation, external support, or other stopgap measures for segments identified as highest risk in the 2011–2015 inspection data but not yet scheduled for or awaiting full rehabilitation. Upon information and belief, no temporary internal liner or stopgap structural reinforcement had been installed in the collapsed segment prior to failure.

e.    **Environmental safeguards:** Pre-positioned containment booms, automated overflow detection and notification systems, and agreements with downstream water utilities and park authorities for immediate response coordination. Upon information and belief, containment and downstream notification protocols were not pre-positioned in a manner sufficient to prevent multi-day uncontrolled discharge.

36.    Each of these measures is operational in nature. None requires second-guessing DC Water's budget allocation or its rehabilitation sequencing. Plaintiff does not challenge DC Water's discretionary policy judgments regarding capital budgeting, long-term rehabilitation sequencing, or allocation of infrastructure resources. Plaintiff asks only whether, having made its prioritization choices, DC Water took reasonable operational steps to protect the public from the foreseeable risks created by the pipe segments it chose to leave in service while awaiting rehabilitation. DC Water failed to take any of these steps.

*F. Injury to Plaintiff and the Class*

37.    As a direct and proximate result of DC Water's conduct, Dr. Lailas will be forced to incur out-of-pocket costs for vessel inspection, cleaning, and decontamination. The contaminated waters in which his vessel is moored have entered or are at risk of entering the vessel's raw water intake system, risking damage to the engine cooling system, air conditioning, and other onboard systems. Dr. Lailas has been unable to use his vessel for recreation or other

purposes since January 19, 2026. Dr. Lailas's use and enjoyment of his vessel and the surrounding waterway have been materially degraded. Dr. Lailas has also been deprived of his right to use the Potomac River for navigation and recreation in the affected area.

38.    Class Members have suffered similar injuries including, but not limited to: physical contamination of riparian real property and vessels by sewage-contaminated water; property damage from exposure to untreated sewage; out-of-pocket cleanup and decontamination costs; loss of use and enjoyment of the Potomac River and adjacent areas for recreation, navigation, and commerce; diminished property values; and business interruption and lost revenue for recreational businesses, outfitters, and marinas that experienced closures, curtailed operations, or lost patronage as a direct result of the contamination and associated public health advisories.

## CLASS ALLEGATIONS

### A. Definition of the Class

39.    Plaintiff brings this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification, pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification of one or more classes consisting of persons who, between January 19, 2026 and the date on which the overflow was materially contained, (a) owned or occupied real property riparian to the Potomac River or its tributaries within 15 miles downstream of the Potomac Interceptor collapse site near Lock 10 of the C&O Canal; and/or (b) owned a vessel that was moored at a marina or docking facility on the Potomac River within 15 miles downstream of the collapse site, including but not limited to Columbia Island Marina, Washington Sailing Marina, Fletcher's Boathouse, Thompson Boat Center, and the Georgetown Waterfront; and who incurred out-of-pocket costs, business interruption damages, property contamination or cleaning costs, or

other concrete economic losses proximately caused by the January 19, 2026 Potomac Interceptor overflow event.

40.    The class area boundary and class period end date are subject to modification as discovery may disclose. Plaintiff reserves the right to propose subclasses by jurisdiction and injury type as discovery develops, and to modify the class definition to include additional categories of affected persons if appropriate.

**B. Numerosity**

41.    Preliminary data indicates that there are thousands of persons within the proposed Class Area who own riparian property or vessels moored at marinas and docking facilities on the affected reach of the Potomac River. Multiple marinas, boathouses, and public access points are located within the affected reach, including Columbia Island Marina, Washington Sailing Marina, Fletcher's Boathouse, Thompson Boat Center, and the Georgetown Waterfront. The Class is so numerous that joinder of all members is impracticable.

**C. Commonality and Predominance**

42.    Pursuant to Fed. R. Civ. P. 23(b)(3), numerous common questions of law and fact predominate over any individual questions affecting Class Members, including but not limited to:

a.    whether DC Water owed a duty of care to Plaintiff and Class Members with respect to the operation and maintenance of the Potomac Interceptor;

b.    whether DC Water breached that duty by failing to adequately maintain, monitor, and implement interim safeguards for the PI despite documented knowledge of system-wide corrosion;

c.    whether DC Water's failure to implement adequate emergency preparedness protocols constituted a breach of duty;

16

d.      whether the collapse of the PI and resulting discharge of untreated sewage was a foreseeable consequence of DC Water's acts and omissions;

e.      whether DC Water's conduct constituted a private nuisance, public nuisance, and/or trespass;

f.      whether the discharge of untreated sewage into the Potomac River unreasonably interfered with Plaintiff's and Class Members' use and enjoyment of the river, their vessels, and their properties;

g.      whether Plaintiff and Class Members suffered damages as a proximate result of DC Water's conduct; and

h.      the proper measure of damages incurred by Plaintiff and the Class.

### D. Typicality

43.    Plaintiff's claims are typical of those of the Class. Plaintiff and Class Members all suffered injury from the same source: DC Water's failure to adequately maintain the Potomac Interceptor, resulting in the discharge of untreated sewage into the Potomac River. If brought and prosecuted individually, the claims of each Class Member would require proof of substantially the same material facts, utilize the same evidence including expert testimony, rely upon the same legal theories, and seek the same type of relief.

### E. Adequacy of Representation

44.    Plaintiff's claims are sufficiently aligned with the interests of the absent Class Members. Plaintiff will fairly and adequately represent the interests of the Class and does not have interests adverse to the Class. Plaintiff has retained the services of counsel experienced in complex litigation, who will vigorously prosecute this action on behalf of all Class Members.

17

*F. Superiority*

45.    A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint. Individual claims by Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake. The concentration of litigation of these claims in one forum will achieve efficiency, promote judicial economy, and ensure consistent adjudication of common issues. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427 (4th Cir. 2003).

## COUNT I — NEGLIGENCE

46.    Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs as if fully restated herein.

47.    DC Water, as the owner and operator of the Potomac Interceptor, owed a duty of care to Plaintiff and Class Members to maintain the PI in a reasonably safe condition and to prevent foreseeable harm to persons and property. Under Maryland law, the standard is whether the defendant exercised the care that a reasonably prudent person would exercise under similar circumstances. This duty extended to foreseeable users of the Potomac River and the C&O Canal, including recreational boaters, vessel owners, riparian property owners, and businesses dependent on river access.

48.    DC Water's duty of care was further informed by its NPDES permit (administratively extended under 40 C.F.R. § 122.6), the federal consent decrees, and the NPS right-of-way permit terms under 36 C.F.R. § 14.10(c)(3), each of which imposed or reflected specific operational and maintenance obligations on DC Water with respect to the PI system.

49.    DC Water breached its duty of care in the following respects, among others:

a.    Failing to adequately maintain, inspect, and monitor the PI despite actual knowledge, derived from its own 2011–2015 comprehensive inspection, that the majority of pipe segments were corroding;

b.    Failing to implement adequate interim safeguards—including enhanced monitoring, flow management protocols, interim structural reinforcement, and pre-positioned containment measures—for the highest-risk, not-yet-rehabilitated segments of the PI, particularly those adjacent to the Potomac River;

c.    Failing to develop and maintain adequate emergency response plans and pre-positioned bypass equipment calibrated to the foreseeable contingency of a large-diameter pipe failure in the C&O Canal corridor, resulting in a five-day delay in activating bypass pumping during which approximately 194 million gallons of raw sewage entered the river, when a reasonably prudent operator would have maintained pre-planned emergency bypass strategies sufficient to substantially reduce uncontrolled discharge duration following foreseeable structural failure events;

d.    Failing to conduct a contemporaneous condition assessment of the collapsed section—which DC Water's own prioritization had identified as among the highest-risk segments in the system—while actively performing rehabilitation on the adjacent upstream segment, and failing to implement interim monitoring, containment, or contingency measures for the collapsed section during the period in which it remained in active service carrying full flow while the adjacent segment was taken offline for rehabilitation;

e.    Continuing to operate the PI at full capacity through corroding, 60-year-old pipe segments while awaiting rehabilitation, adjacent to a navigable river and a national park without adequate monitoring, emergency preparedness, or interim protective measures.

50.    DC Water's negligent maintenance of the PI was a substantial factor in producing the collapse and the resulting discharge of untreated sewage. *See Eagle-Picher Indus., Inc. v. Balbos*, 326 Md. 179, 210 (1992). The collapse and discharge were the direct and foreseeable result of DC Water's failure to exercise reasonable care. The invasion and subsequent damages suffered by Plaintiff and the Class were reasonably foreseeable by DC Water, which had actual knowledge of the PI's deteriorated condition for over a decade.

51.    DC Water's negligence was operational, not discretionary. Plaintiff does not challenge DC Water's policy-level decisions regarding rehabilitation sequencing or budget allocation. Rather, the gravamen of the negligence claim is DC Water's failure to manage the foreseeable risk of catastrophic failure in the pipe segments it chose to leave in service while awaiting rehabilitation—including its failure to assess, monitor, or implement interim protective measures for the collapsed section even while its engineers were physically present rehabilitating the adjacent segment. DC Water's mandatory obligations under its NPDES permit, the federal consent decrees, and the NPS right-of-way permit terms leave no room for discretion with respect to the unpermitted discharge of raw sewage into navigable waters. The decision to operate a sewer system is discretionary; the manner of that operation—including the obligation to exercise due care in maintenance and to comply with regulatory requirements—is not.

52.    DC Water's conduct further constitutes gross negligence and conscious disregard of a known risk. DC Water had actual, documented knowledge since at least 2011 that the PI was corroding system-wide. DC Water knew that the specific corridor where the collapse occurred presented heightened structural risk—as evidenced by the fact that it was actively rehabilitating the adjacent segment. Yet DC Water conducted no contemporaneous condition assessment of the collapsed section while its engineers and contractors were on site performing the adjacent

rehabilitation—a failure of basic operational diligence that is independent of any sequencing or budgetary decision. Despite this knowledge, and despite the catastrophic consequences that would foreseeably result from a large-diameter pipe failure adjacent to the Potomac River, DC Water consciously chose to continue operating the unremediated segment at full capacity without implementing any of the interim protective measures described above.

53.     As a direct and proximate result of DC Water's negligence, Plaintiff and Class Members have suffered damages including, but not limited to, physical contamination of property, out-of-pocket cleanup and decontamination costs, loss of use and enjoyment, diminished property values, business interruption, and other injuries as set forth herein.

## COUNT II — PRIVATE NUISANCE

54.     Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs as if fully restated herein.

55.     Under Maryland law, a private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land. *See Wietzke v. Chesapeake Conf. Ass'n of Seventh-Day Adventists*, 421 Md. 355 (2011) (citing Restatement (Second) of Torts § 821D). A private nuisance exists where the defendant's conduct is the legal cause of an invasion that is intentional and unreasonable, or unintentional but otherwise actionable under negligence principles. Restatement (Second) of Torts § 822.

56.     DC Water's discharge of untreated sewage into the Potomac River constitutes an invasion of the interests of Class Members who own or occupy real property riparian to the affected reach of the Potomac River and its tributaries. Plaintiff's vessel is moored at Columbia Island Marina on the Pentagon Lagoon, a waterway riparian to and directly connected with the Potomac River, and the contamination of the waters surrounding his vessel constitutes an invasion of his

interest in the use and enjoyment of his mooring and the surrounding waterway. The contamination has, among other things:

    a.    prevented Plaintiff and Class Members from using their vessels and the Potomac River for recreation, navigation, and commerce;

    b.    caused Plaintiff and Class Members to be unable to safely operate vessel systems that draw in river water, including engine cooling and air conditioning;

    c.    caused substantial discomfort, inconvenience, and health concerns associated with proximity to sewage-contaminated water;

    d.    diminished the value of Plaintiff's and Class Members' vessels and riparian properties;

    e.    deprived Plaintiff and Class Members of the full value of their property interests and their right to use and enjoy the Potomac River; and

    f.    diminished the revenues, profits and values of businesses that rely on use and enjoyment of the waterway itself.

57.    DC Water's interference with Plaintiff's and Class Members' use and enjoyment of their properties and the waterway is unreasonable. The gravity of the harm—hundreds of millions of gallons of raw sewage discharged into a major navigable waterway serving millions of people—far outweighs any utility of DC Water's failure to maintain the PI. DC Water knew of the PI's deteriorated condition for over a decade and failed to take reasonable steps to prevent or contain the very type of catastrophic failure that occurred. *See Washington Suburban Sanitary Comm'n v. CAE-Link Corp.*, 330 Md. 115 (1993); Restatement (Second) of Torts § 822.

58.    Plaintiff and Class Members did not consent to the invasion of their property interests by untreated sewage.

59.     DC Water's substantial and unreasonable interference with Plaintiff's and Class Members' use and enjoyment of their properties constitutes a private nuisance for which DC Water is liable for all damages arising therefrom, including compensatory, exemplary, and injunctive relief.

## COUNT III — PUBLIC NUISANCE

60.     Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs as if fully restated herein.

61.     Under Maryland law, a public nuisance is an unreasonable interference with a right common to the general public. *Tadjer v. Montgomery County*, 300 Md. 539, 553 (1984) (adopting Restatement (Second) of Torts § 821B). The interference must affect an interest common to the general public, rather than one peculiar to an individual. *Id.* Whether an interference is unreasonable is determined by considering whether the conduct involves a significant interference with the public health, public safety, public peace, public comfort, or public convenience. *Id.*

62.     The Potomac River is a navigable water of the United States and serves as a critical public resource for the communities of Maryland, Virginia, and the District of Columbia. The Potomac River and its adjacent lands, including the C&O Canal National Historical Park, are used by the general public for recreation, navigation, fishing, and other purposes. The Potomac River also serves as the drinking water source for approximately five million people in the Washington, D.C. metropolitan area.

63.     DC Water's discharge of untreated sewage into the Potomac River constitutes a significant interference with the public health, public safety, and public comfort. Independent testing documented *E. coli* concentrations at the outflow orders of magnitude above the 410 MPN/100 mL primary-contact threshold referenced by EPA and used by state and District

agencies, prompting public health advisories from multiple jurisdictions warning against all water-contact activities in the affected reach. Recreational facilities and businesses were forced to curtail or suspend operations. The discharge constitutes a paradigmatic public nuisance.

64.    DC Water knew that the PI was severely deteriorated and that a catastrophic failure could result in a massive discharge of raw sewage into the Potomac River. Despite this knowledge, DC Water failed to take reasonably adequate steps to prevent or contain the discharge. DC Water's conduct was unreasonable in light of the magnitude of the risk and the severity of the foreseeable consequences. *See Washington Suburban Sanitary Comm'n v. CAE-Link Corp.*, 330 Md. 115 (1993).

65.    Plaintiff and Class Members have suffered special damages different in kind—not merely in degree—from the harm suffered by the general public. Plaintiff's vessel is moored in the contaminated waters and has been rendered unusable; he has incurred specific out-of-pocket costs for vessel cleaning and inspection, and has suffered physical contamination of his property, which the general public has not. Class Members include vessel owners whose vessels have been physically contaminated, riparian property owners whose land has been invaded by sewage-contaminated water, and recreational businesses that have suffered particularized closures, lost revenue, and out-of-pocket costs beyond the generalized inconvenience experienced by the public at large. Plaintiff and Class Members therefore have standing to bring a private action for public nuisance. *See* Restatement (Second) of Torts § 821C; *see also Exxon Mobil Corp. v. Ford*, 433 Md. 426 (2013).

66.    DC Water's substantial and unreasonable interference with rights common to the general public constitutes a public nuisance for which DC Water is liable for all damages, including compensatory, injunctive, exemplary, and/or other relief allowable by law.

24

## COUNT IV — TRESPASS

67.    Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs as if fully restated herein.

68.    Under Maryland law, a trespass occurs when a defendant intentionally or negligently causes a physical invasion of another's interest in the exclusive possession of land or chattels. *See* Restatement (Second) of Torts § 158 (trespass to land); § 217 (trespass to chattels). A trespass may be committed by causing a thing to enter the land of another or by causing a physical contact with a chattel in the possession of another.

69.    DC Water's operation and maintenance of the PI caused the physical discharge of untreated sewage into the Potomac River and its tributaries. This sewage physically invaded the riparian properties of Class Members and the waters in which Plaintiff's and Class Members' vessels are moored. The sewage has entered or is at risk of entering Plaintiff's vessel through its raw water intake system, constituting a physical invasion of the vessel itself and a trespass to Plaintiff's chattel.

70.    DC Water's trespass was the direct and foreseeable result of its failure to adequately maintain the PI, a system it owned, operated, and controlled. The discharge was not an act of God or an unforeseeable event; it was the predictable consequence of decades of documented corrosion and inadequate maintenance. DC Water intended to continue operating the PI at full capacity through corroding pipe segments adjacent to the Potomac River, and the invasion of Plaintiff's and Class Members' property interests was the substantially certain result of that conduct.

71.    Plaintiff and Class Members did not consent to the physical invasion of their properties, vessels, and waterways by raw sewage.

25

72.     As a direct and proximate result of DC Water's trespass, Plaintiff and Class Members have suffered damages including property damage, physical contamination of land and chattels, out-of-pocket cleanup costs, loss of use and enjoyment, diminished property values, and other injuries as set forth herein.

## RESERVATION OF RIGHTS — FORTHCOMING FEDERAL CLAIMS

73.     On or about February 20, 2026, Plaintiff sent, via certified mail, return receipt requested, formal notice of intent to file a citizen suit under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, upon DC Water, the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of EPA Region 3, the Secretary of the Maryland Department of the Environment, and the Director of the District of Columbia Department of Energy and Environment, in accordance with CWA § 505(b)(1)(A) and 40 C.F.R. Part 135.

74.     The 60-day notice alleges violations of the Clean Water Act arising from the discharge of untreated wastewater associated with the Potomac Interceptor collapse into the Potomac River. Plaintiff alleges that DC Water holds an NPDES permit for its Blue Plains wastewater treatment operations (Permit No. DC0021199), which EPA has administratively extended under 40 C.F.R. § 122.6, and that the overflow discharge at issue was not an "authorized discharge" under the Clean Water Act and/or violated applicable NPDES and standard permit conditions, including requirements for proper operation and maintenance and restrictions on bypass. *See, e.g.*, 40 C.F.R. §§ 122.6, 122.41(e), 122.41(m). The notice further alleges that each day of unauthorized discharge constitutes a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

75.     Upon expiration of the 60-day statutory notice period, Plaintiff intends to amend this Complaint to add claims under the Clean Water Act, including claims for injunctive relief,

civil penalties of up to $68,445 per day per violation (as adjusted for inflation pursuant to 40 C.F.R. § 19.4, Table 1, for penalties assessed on or after January 8, 2025), pursuant to CWA § 309(d), 33 U.S.C. § 1319(d), as incorporated by CWA § 505(a), 33 U.S.C. § 1365(a), and reasonable attorney's fees and costs pursuant to CWA § 505(d), 33 U.S.C. § 1365(d). Plaintiff reserves all rights to assert such claims and any additional federal statutory claims, including but not limited to claims under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972.

76.    The addition of federal Clean Water Act claims will provide this Court with federal question jurisdiction under 28 U.S.C. § 1331, in addition to the diversity and CAFA jurisdiction already alleged and will support the exercise of supplemental jurisdiction over the state-law tort claims asserted herein pursuant to 28 U.S.C. § 1367.

77.    As of the date of filing of this Complaint, no federal or state agency has commenced and is diligently prosecuting a civil or criminal action against DC Water for the violations described in the 60-day notice. The existing consent decree entered in *Anacostia Watershed Society, et al. v. District of Columbia Water and Sewer Authority*, Consolidated Civil Action No. 1:00CV00183TFH (D.D.C.), as amended May 19, 2015, addresses combined sewer overflow control and does not resolve or extinguish the sanitary sewer overflow violations alleged herein. The decree expressly provides that compliance with the decree does not relieve DC Water of its obligation to comply with the Clean Water Act or any other applicable law. *See Washington Suburban Sanitary Comm'n v. CAE-Link Corp.*, 330 Md. 115, 131 (1993).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment as follows:

A.    Certification of the proposed Class pursuant to Federal Rule of Civil Procedure 23;

27

B.      Designation of Plaintiff as representative of the proposed Class and designation of his counsel as Class Counsel;

C.      Judgment in favor of Plaintiff and the Class Members and against Defendant on all counts;

D.      An award to Plaintiff and Class Members of compensatory damages in an amount to be determined at trial, including but not limited to damages for property damage, physical contamination and cleanup costs, loss of use and enjoyment, diminished property values, business interruption, and all other damages proven at trial;

E.      An award of exemplary or punitive damages to the extent permitted by law;

F.      Injunctive relief requiring DC Water to (a) complete repair of the collapsed section of the PI on an expedited schedule; (b) develop and implement a comprehensive monitoring, maintenance, and emergency preparedness program for the PI system, with priority given to highest-risk sections; (c) implement interim protective measures including enhanced monitoring, pre-positioned emergency bypass equipment, and containment systems for all high-risk segments; and (d) submit regular public reports on the condition and repair status of the PI system;

G.      Pre-judgment and post-judgment interest at the highest rate permitted by law;

H.      An award of Plaintiff's reasonable attorney's fees and costs of litigation; and

I.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:   ____March 6____, 2026

Andrew Levetown (D.Md. Bar No. 30619)
Levetown Law, PLLC
1439 Woodhurst Blvd.
McLean, Virginia 22102
(703) 618-2264
Andrew@Levetownlaw.com


Gilbert Mears (MD State Bar No. 0912160243)
Law Office of G.W. Mears LLC
5513 Johnsontown Rd.
Chestertown, MD 21620
(410) 708-2977
Gilbert@GWMearsLaw.com
Pro Hac Vice Motion Forthcoming


Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
Pro Hac Vice Motion Forthcoming


Nathan Emmons
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
nathane@hbsslaw.com
Pro Hac Vice Motion Forthcoming


*Counsel for Plaintiff Dr. Nicholas Lailas, M.D.*

29

### APPENDIX: PHOTOGRAPHS RELATED TO POTOMAC INTERCEPTOR COLLAPSE AND SEWAGE DISCHARGE

The following photographs, obtained from publicly available sources, depict conditions at and near the Potomac Interceptor collapse site during the period of the overflow. These images are submitted to illustrate the factual allegations set forth in this Complaint.

**Photo 1**

This photograph depicts untreated sewage overflowing from the collapsed section of the Potomac Interceptor into a creek bed adjacent to the Clara Barton Parkway in Montgomery County, Maryland, on or about January 23, 2026.



**Source:** https://ca.news.yahoo.com/see-video-photos-potomac-river-205043484.html (last visited Mar. 6, 2026). Source caption reads, "Untreated sewage spills out of the collapsed Potomac Interceptor sewer line next to the Clara Barton Parkway in Bethesda, Maryland on Jan. 23, 2026."

## Photo 2

This photograph depicts untreated sewage overflowing from the collapsed section of the Potomac Interceptor into a creek bed adjacent to the Clara Barton Parkway in Montgomery County, Maryland, on or about January 23, 2026.



**Source:** https://www.cnn.com/2026/01/23/politics/sewage-spill-potomac-river-washington (last visited Mar. 6, 2026). Source caption reads, "Raw sewage flows into the Potomac River after a massive sewage pipe rupture in Glen Echo, Maryland, on Friday. Cliff Owen/AP."

**Photo 3**

This photograph depicts the collapsed section of the Potomac Interceptor along the Clara Barton Parkway in Montgomery County, Maryland, showing the scale of the structural failure in the 72-inch diameter reinforced concrete pipe.



**Source:** https://www.thebanner.com/community/local-news/sewage-potomac-river-potomac-interceptor-EBGNVRAPVNGOZN34BKZGH3YVTA/ (last visited Mar. 6, 2026). Source caption reads, "A major sewage line that runs along the Clara Barton Parkway in Montgomery County collapsed earlier this week. (Rondez Green/The Banner)"

**Photo 4**

This photograph, taken on or about February 16, 2026, depicts the temporary bypass pumping system installed by DC Water, including industrial pumps and temporary piping diverting wastewater into the C&O Canal around the collapsed section of the Potomac Interceptor near Cabin John, Maryland.



**Source:** https://ca.news.yahoo.com/see-video-photos-potomac-river-205043484.html (last visited Mar. 6, 2026). Source caption reads, "Pumps and pipes divert raw sewage into the C&O Canal and around a broken section of the Potomac Interceptor, a 6-foot-wide pipe that collapsed on Jan. 19, in between the Clara Barton Parkway and the canal on Feb. 16, 2026 in Cabin John, Maryland. More than 300 million gallons of raw sewage poured into the Potomac River after the underground pipeline collapsed on Jan. 19."

## Photo 5

This photograph depicts a public health warning sign posted near the Potomac Interceptor collapse site in Glen Echo, Maryland, with sewage visibly flowing into the Potomac River in the background, on or about January 23, 2026.



**Source:** https://www.cnn.com/2026/01/23/politics/sewage-spill-potomac-river-washington (last visited Mar. 6, 2026). Source caption reads, "A recently placed warning sign is seen at the sight [sic] of a massive pipe rupture, as sewage flows into the Potomac River, right, in Glen Echo, Maryland, on Friday. (Cliff Owen/AP)"

**Photo 6**

This photograph, taken on or about February 16, 2026, depicts conditions along a trail at or near the Potomac Interceptor collapse site approximately four weeks after the initial failure, during the period in which bypass pumping operations were underway but residual overflow continued.



**Source:** https://potomac.org/blog/2026/1/30/potomac-interceptor-sewage-spill-updates (last visited Mar. 6, 2026). Source caption reads, "Taken on Feb. 16, 2026."