**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JACK MILLER, et al.** | : | |
| Individually and on behalf of all | : | |
| others similarly situated | : | |
| | : | |
| **Plaintiffs,** | : | |
| v. | : | **Civil Action No. 8:26-cv-00989-CDA** |
| | : | |
| **DISTRICT OF COLUMBIA WATER** | : | |
| **AND SEWER AUTHORITY,** | : | |
| **d/b/a DC WATER** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Defendant District of Columbia Water and Sewer Authority ("DC Water"), by its undersigned counsel, submits this memorandum in support of its Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because this Court lacks subject matter jurisdiction and pursuant to Rule 12(b)(6) because the Complaint fails to state a claim upon which relief can be granted.

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT .........................................................................................1

II. STATEMENT OF RELEVANT FACTS ..........................................................................1

    A.  Potomac Interceptor Construction ......................................................................1

    B.  Potomac Interceptor Rehabilitation Project........................................................2

    C.  January 19, 2026 to March 17, 2026...................................................................3

    D.  The Pleadings......................................................................................................6

III. LEGAL STANDARDS ....................................................................................................7

    A.  FRCP 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction ......7

    B.  FRCP 12(b)(6) Motion to Dismiss for Failure to State a Claim ..........................8

IV. ARGUMENT.....................................................................................................................8

    A.  The Court Does Not Have Jurisdiction Because Plaintiffs Lack Standing...........8

    B.  Governmental Immunity Bars Subject Matter Jurisdiction ...............................14

    C.  The Four Counts Fail to State Any Claim Upon Which Relief Can be Granted...............18

        1.  Negligence ...........................................................................................19

            a.  Plaintiffs Have Not Pled Duty or Breach (All Plaintiffs—Maryland, District of Columbia, and Virginia Law) ................................................................20

            b.  Fishing Plaintiffs' and Marina's Economic Damages are Incognizable (Fishing Plaintiffs – Maryland law; Prince William Marina – Virginia Law) and Yacht Plaintiffs are Owed No Duty Under the District of Columbia's Public Duty Doctrine (Yacht Plaintiffs – District of Columbia Law) ...................................21

        2.  Private Nuisance (Miller – Maryland Law) ............................................24

        3.  Public Nuisance (All Plaintiffs – Maryland, District of Columbia, and Virginia Law) .................................................................................................26

        4.  Trespass to Land (Miller – Maryland Law)............................................28

        5.  Trespass to Chattels (Yacht Plaintiffs – District of Columbia Law) ...........29

CONCLUSION.........................................................................................................................30

EXHIBITS

ii

## I. PRELIMINARY STATEMENT

This is a tort action related to Plaintiffs' interests allegedly affected by the January 19, 2026 collapse of a DC Water sewer line and the resulting release of sewage to the Potomac River.[1] The point at which the release occurred in Cabin John, Maryland is *downstream* of Plaintiff Miller's Bethesda, Maryland residence; over 10 miles upstream of where Plaintiffs Hosseini's and Lailas's yachts are moored in the District of Columbia; over 30 miles upstream of where the Occoquan River (where Plaintiff Prince William Marina's business is located in Virginia) meets the Potomac; over 65 miles downstream of Plaintiff L.J.K. Outdoors' marina, Goose Bay Marina in Maryland; and an unspecified distance upstream of Plaintiff KJ's Outdoor Adventures' and L.J.K. Outdoors' charter fishing areas in Maryland.

Exhibit 1 shows the failure site and other locations along the pertinent 72.5-miles of the Potomac River. Smaller scale maps depicting Plaintiffs' best-known locations are attached as Exhibits 2–5.

Plaintiffs lack standing; this suit is barred by governmental immunity; and Plaintiffs' claims (negligence, private nuisance, public nuisance, trespass to land and trespass to chattels) fail to state a claim upon which relief can be granted. For any of these three grounds, the Complaint should be dismissed.

## II. STATEMENT OF RELEVANT FACTS

**A.  Potomac Interceptor Construction and Permit to Discharge in District of Columbia**

In 1960, Congress authorized the District of Columbia to construct a sewer line ("Potomac Interceptor" or "PI") to serve Dulles International Airport. 86 P.L. 515; 74 Stat. 210, June 12,

---

[1] DC Water, "Key Findings on Extent of Sewer Overflow and Potomac River Impact" (Feb. 6, 2026), available at https://www.dcwater.com/about-dc-water/media/news/dc-water-releases-key-findings-extent-sewer-overflow-and-potomac-river.

1960. Congress provided a $3,000,000 appropriation and up to $25,000,000[2] in financing for the project. *Id*. The Potomac Interceptor is a 54-mile sewer line ranging in size from 36 to 92 inches in diameter that can convey up to 60 million gallons per day to the Blue Plains Advance Wastewater Treatment Plant.[3] It continues to serve Dulles International Airport as well as bordering sewer customers in Virginia and Maryland generally on the path from Dulles International Airport to DC Water's Blue Plains Advanced Wastewater Treatment Plant.

In 1996, the District of Columbia enacted D.C. Law 11-111, "Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996," which was effective that year after Congressional review and is DC Water's enabling legislation. *See* D.C. Code §§ 34-2201.01 through 34-2202.41. This legislation established DC Water as a District of Columbia governmental entity separate from the District of Columbia and vested it with, among other powers, authority over the PI. *Id*.

## B.  Potomac Interceptor Rehabilitation Project

Like utilities throughout the United States, DC Water is investing heavily to renew aging public infrastructure in the face of limited resources. Sewer rehabilitation projects like DC Water's Potomac Interceptor rehabilitation project ("Project") require prioritization and sequencing of available finances and resources. The Project is a comprehensive discretionary exercise that entails a myriad of interrelated decisions about capital budgeting, rehabilitation sequencing, resource allocation, land use and other permitting, etc.

As part of the Project, DC Water inspected the entire 54-mile Potomac Interceptor from 2011 to 2015, which revealed that a majority of the Potomac Interceptor had varying levels of

---

[2] $28,000,000 in 1960, adjusted for an average inflation rate of 3.72%, would be $312,363,648.65 in today's dollars.
[3] DC Water, "Potomac Interceptor Collapse," available at https://www.dcwater.com/about-dc-water/media/potomac-interceptor-collapse; DC Water, "Potomac Interceptor Project," available at https://www.dcwater.com/potomacinterceptor.

corrosion. DC Water proactively budgeted $625,000,000 for the Project—more than double the federal funds available for original construction[4]—over ten years to prioritize rehabilitation of the most vulnerable sections. *See* Compl. at p. 13, ¶ 39[5] ("In response to its inspection findings, DC Water initiated a $625 million, 10-year capital improvement program to rehabilitate the PI's most vulnerable sections, as part of its broader $10 billion Capital Improvement Program."). Project work on PI sections like the collapsed section that are within National Park Service (NPS) land require federal environmental review and NPS permit approval.

DC Water inspected the PI section that failed in 2026 again in 2017, 2021 and twice in 2024. Compl. at p. 12, ¶ 36. DC Water recently obtained a NPS permitting emergency exemption and expended $9,600,000 to rehabilitate an 800-foot PI section that was more vulnerable and approximately one-quarter mile upstream from the section which collapsed. *See* Compl. at p. 15, ¶¶ 45-46.[6]

## C. January 19, 2026 to March 17, 2026

On January 19, 2026, a 72-inch diameter segment of the Potomac Interceptor collapsed causing sewage to flow into the Potomac River near the Clara Barton Parkway within NPS's Chesapeake & Ohio Canal National Historical Park in Montgomery County, Maryland.

By January 24, 2026, DC Water, working through sub-freezing temperatures, substantially stopped the flow of sewage from the Potomac Interceptor into the Potomac River by utilizing

---

[4] *See supra* note 2.

[5] "Compl." is used in this Memorandum to refer to the Second Amended Class Action Complaint and Jury Demand filed July 9, 2026 (ECF No. 33).

[6] *See also* Aaron C. Davis, *Catastrophic Sewage Spill Followed Years of Delay on Repairs, Post Review Finds*, Wash. Post (Apr. 2, 2026), https://www.washingtonpost.com/investigations/2026/04/02/potomac-interceptor-sewer-repair-delay/ ("On Dec. 12, 2024, D.C. Water officials met with Park Service officials [. . . and] said it needed approval to begin repairs on the most critical 800 feet that appeared to be in imminent danger of failing . . . . D.C. Water officials hoped to resume work on the next segment this summer.").

bypass pumps and a section of the C & O Canal for temporary conveyance of flows back into an undamaged, downstream section of the PI.[7]

On February 8, 2026, the last overflow to reach the Potomac River occurred, and all overflows were contained by March 1, 2026.[8]

Unrelated to the Potomac Interceptor, the District of Columbia has banned purposeful contact, including swimming, in the Potomac River since 1971 due to water quality concerns, including *E. coli* bacteria. D.C. Mun. Regs. tit. 21 § 1108.1.[9] The United States Environmental Protection Agency has issued primary contact recreational water quality criteria, including a 410 cfu/100mL numeric criterion for *E. coli*, to "protect primary contact recreation, including swimming, bathing, surfing, water skiing, tubing, water play by children, and similar water contact activities where a high degree of bodily contact with the water, immersion and ingestion are likely."[10] The 410 cfu/100 mL criterion is used as a beach swimming advisory level that is not to be exceeded in the Potomac River in more than 10 percent of samples over a 90-day period. *See* 9 VAC 25-260-170; *see also* D.C. Mun. Regs. tit. 11 § 21-1104.8. Beach water samples above that level will often trigger a "no swimming" advisory at public beaches.[11]

---

[7] DC Water, "UPDATE: DC Water Activates Bypass to Contain Wastewater Overflows from Potomac Interceptor" (Jan. 24, 2026), available at: https://www.dcwater.com/about-dc-water/media/news/update-dc-water-activates-bypass-contain-wastewater-overflows-potomac.

[8] DC Water, "UPDATE: Progress on Potomac Interceptor Repair and Environmental Restoration Efforts" (March 1, 2026), available at: https://www.dcwater.com/about-dc-water/media/news/update-progress-potomac-interceptor-repair-and-environmental-restoration.

[9] District of Columbia Dep't of Energy and Env. "Water Quality & Swimming," available at https://doee.dc.gov/service/water-quality-swimming.

[10] U.S. EPA, "2012 Recreational Water Quality Criteria" (Dec. 2012), available at https://www.epa.gov/sites/default/files/2015-10/documents/rec-factsheet-2012.pdf#:~:text=coli:%20Culturable%20E.%20coli%20at%20a%20GM,equivalent%20method%20that%20measures%20culturable%20E.%20coli. Cfu/100mL or colony forming units per 100 milliliters are equal to MPN/100 mL or most probable number per 100 milliliters.

[11] *See, e.g.*, Maryland Dep't of Health, "Healthy Beaches," available at https://mde.maryland.gov/programs/water/MHB/Pages/Maryland-Healthy-Beaches-Home.aspx.

On February 13, 2026, the Virginia Department of Health recommended "avoid[ing] recreational water activities in the Potomac River, such as swimming, wading, tubing, white-water canoeing or kayaking, where full-body submersion is more likely to occur" and advised that "[w]hen harvesting fish or crabs, discard skin, organs, cook the meat to proper temperature, and clean cutting boards and cutting implements with warm soapy water."[12]

As soon as February 17, 2026, water quality was returning to normal levels for all purposes, even swimming.[13]

By March 5, 2026, the District of Columbia Department of Health, the Maryland Department of Health, and the Virginia Department of Health announced that their cautionary swimming and water contact advisories were lifted in whole or in part. For example, the Virginia Department of Health's notice lifted its health advisory for the Potomac River below the Route 120 Chain Bridge.[14]

On March 14, 2026, DC Water announced that the PI emergency repairs were complete.[15]

---

[12] Virginia Dep't of Health, "Recreational Water Advisory for the Potomac River" (Feb. 13, 2026), available at https://www.vdh.virginia.gov/news/public-relations-contacts/2026-regional-news-releases/vdh-issues-recreational-water-advisory-for-the-potomac-river/.

[13] Virginia Dep't of Health, "VDH Partially Lifts Potomac River Recreational Water Advisory" (Mar. 5, 2026), available at https://www.vdh.virginia.gov/news/public-relations-contacts/2026-regional-news-releases/vdh-partially-lifts-potomac-river-recreational-water-advisory/ ("Water quality sampling results collected by the Virginia Department of Environmental Quality (DEQ) on February 17, 25, 26, and 27 indicate bacteria concentrations in the Potomac River are at levels acceptable for all recreational water use."); District of Columbia Department of Health, "Potomac Sewer Line Collapse Update" (Mar. 2, 2026), available at https://dchealth.dc.gov/page/potomac-sewer-line-collapse-update (lifting February 20, 2026 advisory) ("Ongoing water quality monitoring indicates that bacterial levels have returned to safe ranges for recreational use. . . . Consistent testing results now confirm that conditions have improved and the river is safe for recreation."); Maryland Department of the Environment, "Maryland Department of the Environment Lifts Precautionary Shellfish Harvesting Closure in Potomac River" (Mar. 10, 2026), available at https://news.maryland.gov/mde/2026/03/10/maryland-department-of-the-environment-lifts-precautionary-shellfish-harvesting-closure-in-potomac-river/ ("Results from Feb. 12, Feb. 17, and March 5 match historical data going back decades").

[14] Virginia Dep't of Health, *supra* note 13

[15] DC Water, "Emergency Repairs Completed: Flow Restored to Potomac Interceptor" (Mar. 14, 2026), available at https://www.dcwater.com/about-dc-water/media/news/emergency-repairs-completed-flow-restored-potomac-interceptor.

On March 17, 2026, the Virginia Department of Health lifted its remaining advisory.[16]

On May 6, 2026, EPA announced that there were no longer any material water quality impacts attributable to the Potomac Interceptor collapse.[17]

**D.  The Pleadings**

On March 6, 2026, a day after the cautionary advisories pertinent to Dr. Nicholas Lailas, M.D.'s (Lailas) alleged damages were lifted, he filed the original complaint in this action (ECF No. 1).

On March 31, 2026, DC Water moved to dismiss (ECF No. 17).

On April 17, 2026, Lailas amended his complaint (ECF No. 22). The first amended complaint added as named plaintiffs Jack Miller (Miller), KJ's Outdoor Adventures, LLC (KJ's), Prince William Marina, Inc. (Prince William Marina), and Arian Hosseini (Hosseini).

Separate from this action, on April 20, 2026, the United States and the State of Maryland filed enforcement actions in the United States District Court for the District of Columbia and the Maryland Circuit Court for Montgomery County, respectively. Compl. at p. 37, ¶¶ 121-123 (the enforcement action complaints are in the record for this case at ECF Nos. 23-5 and 23-6).

On July 9, 2026, the Court granted leave (ECF No. 31) for a second amended complaint (ECF No. 33, the Complaint). The Complaint added a sixth named plaintiff, L.J.K. Outdoors, LLC (L.J.K. Outdoors, collectively with KJ's, the Fishing Plaintiffs) and includes two counts for all Plaintiffs: count I negligence and count III public nuisance; two counts for Miller: count II private nuisance and count IV trespass to land; and one count for Plaintiffs Lailas and Hosseini

---

[16] Virginia Dep't of Health, "VDH Lifts Potomac River Recreational Water Advisory" (Mar. 17, 2026), available at https://www.vdh.virginia.gov/blog/2026/03/17/vdh-lifts-potomac-river-recreational-water-advisory/.
[17] *See* United States Environmental Protection Agency, "Ahead of Schedule, EPA Fully Achieves Potomac River Recovery Goals" (May 6, 2026) available at https://www.epa.gov/newsreleases/ahead-schedule-epa-fully-achieves-potomac-river-recovery-goals.

(collectively, the Yacht Plaintiffs): count V trespass to chattels. The Complaint is also styled as a class action with a class area extending over 72.5 miles of the Potomac River to the Governor Harry W. Nice Memorial Bridge downstream of the PI collapse site. Compl. at pp. 23, 27-36. Plaintiffs allege that the amount in controversy exceeds $75,000 for jurisdictional purposes. Compl. at p. 8, ¶ 22.[18]

### III. LEGAL STANDARDS

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations" to meet the required pleading standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### A. FRCP 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A party may file a motion to dismiss when the court lacks proper subject matter jurisdiction over the case. Fed. R. Civ. Pro. 12(b)(1). Plaintiffs have the burden of establishing the existence of subject matter jurisdiction. *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The court should grant a motion to dismiss when the material jurisdictional facts of the case are not disputed and the moving party is entitled to judgment as a matter of law. *Id.* When considering whether subject matter jurisdiction exists on a motion to dismiss, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings . . . ." *Id.*

Governmental immunity from suit and lack of standing are proper grounds for Rule 12(b)(1) dismissal. *See Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir.

---

[18] DC Water questions whether any Plaintiff has alleged an amount in controversy that could exceed $75,000 for jurisdictional purposes. *See* 28 U.S.C. § 1332; *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 549 (2005) ("where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction.").

7

2002) (discussing immunity in Rule 12(b)(1) context); *Prince v. United States Gov't*, 2025 U.S. Dist. LEXIS 211800, at *4, 6-9 (D. Md. 2025) (dismissing case under Rule 12(b)(1) on standing and immunity grounds). The same procedural standards for Rule 12(b)(6) challenges apply to facial Rule 12(b)(1) challenges. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

**B.  FRCP 12(b)(6) Motion to Dismiss for Failure to State a Claim**

A Motion to Dismiss is appropriate when the Complaint fails to assert a claim upon which the court can grant relief. Fed. R. Civ. P. 12(b)(6). A court reviewing a motion to dismiss for failure to state a claim must determine whether a complaint alleges sufficient facts that go beyond speculation and state a claim that is "plausible on its face." *Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 644-45 (4th Cir. 2018). The court should accept all well-pleaded material facts as true and draw inferences in favor of the plaintiff but should not give a presumption of truth to mere conclusory statements. *Id.*

When reviewing a motion to dismiss for failure to state a claim, a court may consider (1) documents that are explicitly incorporated into the complaint by reference; (2) documents that are attached to the complaint as exhibits; (3) documents "attached to a motion to dismiss as long as they are 'integral to the complaint' and 'authentic;'" and (4) documents that are "matters of public record" of which the court takes judicial notice. *Schneider*, 733 F. App'x at 645 (first quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); and then quoting *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)).

## IV. ARGUMENT

**A.  The Court Does Not Have Jurisdiction Because Plaintiffs Lack Standing**

Plaintiffs fail to allege necessary details to establish standing: when they were harmed and where. Miller does not even provide his address. The Fishing Plaintiffs do not state where they

8

fish on the Potomac River, which is hundreds of miles long, in its tributaries, or in other waters. Prince William Marina does not even allege that any pollution from the Potomac Interceptor reached its marina on the Occoquan River. The Yacht Plaintiffs fail to allege that they had any plans to use their boats between the January 19, 2026 Potomac Interceptor collapse and when water quality was back to normal in February, or certainly no later than March 5, 2026 when agencies lifted their pertinent swimming and water contact health advisories at the very latest.[19] These pleading deficiencies make evident that Plaintiffs do not have a justiciable case and that the Court is without jurisdiction.

Plaintiffs bear the burden to establish standing and must demonstrate a concrete injury that is fairly traceable to a harm caused by a defendant and that is redressable by the filed action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Injuries for standing purposes are temporally and spatially limited, i.e. Plaintiffs must demonstrate when and where[20] they are harmed. A cognizable injury is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560 (citations and internal quotations omitted). In *Lujan*, the plaintiffs' mere *intention*, without any plans demonstrating when, to view wildlife that may have been affected by the challenged regulation was temporally insufficient to establish the injury standing prong. *See id*. at 563-64.

---

[19] The March 5, 2026 date here is conservative given that water quality data showed that *E. coli* levels in the Potomac River declined precipitously after DC Water's bypass system was implemented. DC Water, UPDATE: Potomac Interceptor Overflow Repair," (Feb. 8, 2026), available at https://www.dcwater.com/about-dc-water/media/news/update-potomac-interceptor-overflow-repair-february-8-2026; DC Water, "UPDATE: Emergency Repair Work Set to Begin on Potomac Interceptor," (Mar. 3, 2026), available at https://www.dcwater.com/about-dc-water/media/news/update-emergency-repair-work-set-begin-potomac-interceptor.

[20] DC Water notes that both the Little Falls rapids and the Little Falls Dam (impassible for larger boats and all boats, respectively) are downstream of the PI collapse site, meaning that downstream boat owners cannot travel anywhere close to the location collapse site. *See*  Exhibit 1 and https://dnr.maryland.gov/nrp/documents/boatingsafety/upperpotomac.pdf. (identifying Class V Rapids between Little Falls and Chain Bridge (the approximate border between Maryland and the District of Columbia on the Potomac River).

Plaintiffs' case is distinguishable from *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) where the United States Supreme Court held that the plaintiffs established standing for purposes of surviving summary judgment. There, the *when* question regarding harm was not so much at issue because there was an ongoing violation and the company-pollutant source exceeded its mercury effluent limitation 489 times over eight years. *See Friends of the Earth, Inc.*, 528 U.S. at 176, 184 (noting it was not '"improbable' . . . that company's pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms."). But the Supreme Court looked closely at the plaintiffs' *where* allegations. Because, for example, one plaintiff "testified that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about [company's] discharges." *Id*. at 182. Contrasting and quoting its *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) opinion, the Court stated, "[w]e held that the plaintiff could not survive the summary judgment motion merely by offering 'averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action.' 497 U.S. at 889." *Id*. at 183.

The Fourth Circuit's ruling in *Natural Resources Defense Council v. Watkins*, 954 F.2d 974 (4th Cir. 1992) is also instructive. In *Watkins*, the plaintiffs survived summary judgment by "specifically identif[ying] the portion of the river they utilized with reference to the [discharge site]" and alleging they no longer recreated downstream of the discharge site. *Natural Resources Defense Council v. Watkins*, 954 F.2d at 979. Again, the *when* question was not so much at issue due to long term effluent exceedances, and the court cited *Lujan v. Nat'l Wildlife Fed'n* to

10

distinguish the spatial specificity requirement. *Id*. ("some effects of the thermal pollution caused by the [defendant] will take decades to reverse.").

This Court applied the same principles to a 12(b)(1) motion and dismissed a Clean Water Act citizen suit when the complaint alleged "only conclusory language pertaining to the elements of standing," by stating plaintiffs lived on a polluted river that they used and recreated on. *Richardson v. Mayor of Baltimore*, 2014 U.S. Dist. LEXIS 1277, at \*11-12 (D. Md. 2014). The Court pointed out the temporal deficiencies of failing to plead "a threat of imminent harm" and by "specif[ying] neither the nature nor type of planned use." *Id*. ("To establish an imminent threatened or future injury to his/her use of an area, a plaintiff must assert concrete plans to use the area rather than a vague, 'some day' desire to use the area.") (quoting *EarthReports, Inc. v. U.S. Army Corps of Engineers*, No. 8:10-cv-1834-AW, 2011 U.S. Dist. LEXIS 109184, 2011 WL 4480105, at \*4 (D. Md. Sept. 26, 2011)). In *Richardson*, the complaint was spatially deficient because it did not allege a concrete intent by plaintiff of which area of the river the plaintiff intended to use or recreate on and, therefore, it could not be determined that such unspecified area was within the affected river segment. *Id*. at 12-13.

Miller alleges that he resides "in close proximity to the discharge site," he had to temporarily relocate his family due to odors, "sewage-contaminated water has intruded on his property," "a risk of contamination to his private well," and his property value and recreational use of the Potomac River have been negatively affected. Compl. at p. 5, ⁋ 15, p. 35, ⁋ 112. Yet, Miller does not explain how any of this occurred beyond conclusory *ipse dixit*. To begin, "close proximity" for the odor allegation is in another zip code as Miller alleges that he resides in Bethesda, Maryland, without providing an address, while the PI collapse occurred in the Cabin John zip code. *Compare id. with* Exhibits 2A, 2B. In the Plaintiffs' motion to intervene in the

11

United States' action regarding the collapse of the PI, Miller submitted that his home is two miles from the collapse site. Mem. in Support of Mot. to Intervene at 3, *U.S. v. D.C. Water & Sewer Auth.*, No. 1:26-cv-01346-RDM (D.D.C. May 28, 2026), ECF No. 18. Miller's home appears to be higher in elevation than, and upstream of, the Potomac Interceptor collapse site. It is axiomatic that sewage flows downhill and downstream, so Miller has not pled any logical basis to explain how his property or well could be contaminated by sewage released two miles downhill from his home directly into the Potomac River. Furthermore, while Miller alleges that he has incurred costs testing his well Compl. at p. 5, ¶ 15, he does not allege any health advisory caused him to do so or that his well was ever *actually* contaminated. Miller merely asserts that a risk of contamination was created, a risk that has not been realized several months after the PI collapse and since there has been a documented release from the PI. Miller's unspecified recreational interests, which lack any detail on when and where, are similarly insufficient.

The Fishing Plaintiffs attempt to allege that they experienced fishing charter cancellations and lost revenues due to the Potomac Interceptor collapse but do not provide any detail about when or where these alleged cancelled trips were to occur. *See* Compl. at 5-7, ¶¶ 16, 20. For example, it is unknown whether these trips were planned 30 miles downstream of the Potomac Interceptor collapse site or further, in the Chesapeake Bay, or on waters that are not even downstream of the site. *See* Exhibits 1, 5. The Fishing Plaintiffs also fail to allege when any cancelled trips were scheduled or if they were scheduled.

Prince William Marina is on the Occoquan River over 4 miles upstream of its mouth. The Occoquan River is a Potomac River tributary, and its mouth is over 30 miles downstream of the PI collapse site. *See* Exhibits 1, 3. So, from the PI collapse, the Marina is 30 miles downstream on the Potomac River then 4 miles upstream on the Occoquan River. The Complaint only makes the

bare assertion that "[s]ince the collapse, Prince William Marina has experienced customer cancellations, reduced slip occupancy, and diminished revenue directly attributable to the contamination and associated public health advisories." Compl. at p. 5, ℙ 17. But the Complaint does not allege that the Occoquan River was contaminated or subject to any public health advisory and, thereby, fails to plausibly allege injury or causation.

Central to Yacht Plaintiffs' claims, they allege that they own yachts that they moor at Columbia Island Marina. Compl. at p. 6, ℙℙ 18-19. Columbia Island Marina at the Pentagon Loop Yacht Basin is in the District of Columbia[21] approximately 10 miles downstream of the Potomac Interceptor collapse location. *See* Exhibits 1, 4A. The Yacht Plaintiffs allege loss of use and yacht cleaning damages. Compl. at p. 6, ℙℙ 18-19. Lailas oddly alleges that his boat's motor water intake system may have drawn in contaminated water from the Potomac Interceptor, despite also unequivocally stating that he has not used his yacht "[s]ince the collapse." Compl. at p. 6, ¶ 19 Lailas does not explain how water could have contaminated his motor yacht's intake system when the yacht was not operated since the date of the collapse (January 19, 2026). Despite their loss of use claims, neither Yacht Plaintiff suggests when, during historic cold temperatures, or where on the navigable portion of the Potomac River they would have used their yachts but for the Potomac Interceptor collapse.

Significantly for all Plaintiffs' claims, water quality returned to normal and the swimming and water contact advisories[22] were lifted by March 17, 2026.

---

[21] D.C. Code § 1-101 ("The District of Columbia is that portion of the territory of the United States ceded by the State of Maryland for the permanent seat of government of the United States, including the river Potomac in its course through the District, and the islands therein."); *see also* Exhibit 4B.

[22] Again, the 410 cfu/mL primary contact water quality criterion is designed to protect swimming and other primary contact activities, not secondary contact activities like yachting.

Plaintiffs do not allege any concrete injuries and, accordingly, lack standing. The Court, in turn, lacks subject matter jurisdiction.

## B. Governmental Immunity Bars Subject Matter Jurisdiction

Alternatively, the Court need not look any further than DC Water's governmental immunity to dismiss this case. DC Water has not waived its governmental immunity with respect to the Project, which is highly discretionary rather than ministerial.

Upon its creation by Congress in 1996, DC Water assumed responsibility for the Potomac Interceptor. The Potomac Interceptor was constructed at Congress's direction to serve Dulles International Airport. Today, the Potomac Interceptor serves Prince George's and Montgomery Counties in Maryland and Fairfax County in Virginia. DC Water should be afforded similar immunity as any other sewer utility operating in Maryland and serving Maryland customers.

In its analysis of the Eleventh Amendment, the Supreme Court noted "that the Constitution was understood, in light of its history and structure, to preserve the States' traditional immunity from private suits. *Alden v. Me.*, 527 U.S. 706, 724 (1999).[23] States have sovereign immunity under their own law even when sued in courts in other states. *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 236 (2019) ("hold[ing] that States retain their sovereign immunity from private suits brought in the courts of other States."); *United States v. Maryland (In re Jackson Creek Marine, LLC)*, 153 F.4th 423, 431 (4th Cir. 2025) ("The Supreme Court has 'often described the States' immunity in sweeping terms, without reference to whether the suit was prosecuted in state or

---

[23] DC Water does not assert that it is a state or an arm of the state for purposes of Eleventh Amendment immunity and no federal claims are at issue. *See Northern Ins. Co. v. Chatham County*, 547 U.S. 189, 193 (2006) ("A consequence of this Court's recognition of preratification sovereignty as the source of immunity from suit is that only States and arms of the State possess immunity from suits authorized by federal law.") (citations omitted); *see also id.* at 191 ("Eleventh Amendment immunity . . . is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.' . . . Because preratification sovereignty is the source of immunity from suit, only States and arms of the State possess immunity from suits authorized by federal law." (citations omitted).

federal court.'") (quoting *Alden*, 527 U.S. at 711 and citing *Franchise Tax Bd. of Cal.*, 587 U.S. at 236).

The District of Columbia is a uniquely created and structured sovereign but is a sovereign all the same for immunity purposes. *District of Columbia v. Owens-Corning Fiberglass Corp.*, 572 A.2d 394, 400-01 (D.C. 1989); *Nealon v. District of Columbia*, 669 A.2d 685, 693 (D.C. 1995) ("conclud[ing] that the decision of the District to limit the water pressure in the fire hydrants was discretionary, and therefore the District is immune from liability for its decision."). DC Water is "a corporate body, created to effectuate certain public purposes, that has a separate legal existence within the District government." D.C. Code § 34-2202.02.

District of Columbia courts look to whether a government act is discretionary or ministerial to determine whether immunity applies, recognizing governmental immunity for discretionary acts. The discretionary-or-ministerial test is favored over the related governmental-or-proprietary test. *Powell v. District of Columbia*, 602 A.2d 1123, 1126 (D.C. 1992). The analysis of whether an act is discretionary "goes beyond whether the act entailed a choice among alternatives. It seeks to ascertain whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to ensure fearless, vigorous and effective decision making." *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 81 (D.C. 2003) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C. 1990) (citation and internal punctuation omitted in original).

After observing that "discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy" and that discretionary acts "require personal deliberation, decision and judgment" and "generally have a broad public effect," the D.C. Court of Appeals held that the planned provision of water for fire hydrants was discretionary where reduced water

15

pressure resulted in plaintiff-homeowners' fire damage. *Nealon*, 669 A.2d at 690-91 (internal quotations and citations omitted) (also observing that providing water involved "allocation of financial or natural resources" and "a schedule of operation"). While routine sewer maintenance is ministerial, comprehensive sewer planning is discretionary. *Johnston v. District of Columbia*, 118 U.S. 19, 20-21 (1886) (distinguishing quasi judicial sewer plans from ministerial sewer repair pursuant to plans). "A waiver of sovereign immunity must be 'unequivocally expressed in statutory text.'" *Tucci v. District of Columbia*, 956 A.2d 684, 695 (D.C. 2008) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996) (other citations omitted)).

Plaintiffs do not suggest any waiver of governmental immunity[24] and concede that Potomac Interceptor-related rehabilitation sequencing and budgetary decisions by DC Water are discretionary. Compl. at p. 4, ¶ 14 (carving out of Plaintiffs' claims DC Water's "discretionary policy judgments regarding capital budgeting, rehabilitation sequencing, or resource allocation.") Moreover, Plaintiffs disavow any challenge to DC Water's decisions on how to sequence and prioritize the Potomac Interceptor rehabilitation Project. Compl. at p. 4, ¶ 14; p. 29, ¶ 93 ("The specific failures alleged [in the Complaint] are ministerial and operational in character, not discretionary policy judgments entitled to immunity under DC law. Plaintiffs do not challenge DC Water's policy-level decisions regarding rehabilitation sequencing or capital budget allocation."). Instead, Plaintiffs characterize their claims as a challenge to how DC Water managed the "foreseeable risks created by the pipe segments it chose to leave in service while awaiting rehabilitation". Compl. at p. 22, ¶ 70. The two decisions by DC Water are one and the same—a decision to prioritize the repair of one section of pipe necessarily means other sections will remain in service and await rehabilitation.

---

[24] Indeed, Plaintiffs cite 36 C.F.R. § 14.10(c)(3), which recognizes liability for National Park Service rights-of-way is "subject to legal limitations applicable to governmental permittees." Compl. at p. 11, ¶ 32.

Plaintiffs cannot challenge discretionary decisions with a transparent disclaimer that they are not. Restated, Plaintiffs cannot incorrectly label discretionary decisions as nondiscretionary to expand the Court's jurisdiction. The $625,000,000, ten-year Project design for the regional infrastructure asset that is the Potomac Interceptor is inherently discretionary. It is the written embodiment of engineering judgment by DC Water's technical team as well as a host of national experts. Plaintiffs concede that they are not challenging DC Water's prioritization of Potomac Interceptor segments for rehabilitation.

Any additional act(s) that were not chosen as part of the Project would have necessarily taken away resources for acts that were selected and may have delayed Project completion. Dollars are fungible but do not self-multiply. Like the District of Columbia's decision to reduce water pressure in *Nealon*, DC Water's Project was discretionary. By performing any of the acts Plaintiffs propose that DC Water should have performed, but did not, to allegedly avoid the Potomac Interceptor collapse, those acts would have been part and parcel of the Project and would have directly constrained the resource allocation and professional judgments of DC Water. Similarly, prioritizing and sequencing any acts DC Water took ahead of the other acts Plaintiffs allege DC Water should have taken but did not was also part of the discretionary Project. For example, choosing to spend $9,600,000 to repair the adjacent section of the Potomac Interceptor in which DC Water identified significant structural defects as an emergency priority rather than the segment which failed (but which was planned for rehabilitation in the summer of 2026[25]) was part of DC Water's discretionary decision-making.

Plaintiffs' numerous assertions second-guessing how DC Water should have conducted the Project challenge DC Water's discretionary decisions. Compl. at pp. 21-22, ⁋ 69; p. 29, ⁋ 93.

---

[25] Aaron C. Davis, *supra* note 6.

17

Plaintiffs' arguments that DC Water should have adjusted its inspection frequencies or conducted contemporaneous inspections for "not-yet-rehabilitated segments," implemented flow diversions and/or lowered flow in the PI, pre-positioned bypass equipment, or installed interim structural reinforcements challenge DC Water's discretionary determinations on how best to implement the rehabilitation Project across the 54 miles of the Potomac Interceptor through space and time and involved significant applications of discretionary decision-making. Compl. at pp. 21-22, ⁋ 69. Likewise, Plaintiffs' allegation that DC Water should have developed "adequate" emergency response protocols directly challenges DC Water's discretionary plans for responding to emergencies associated with the PI. Regardless of Plaintiffs' attempts to characterize its additional "measures" as "operational in nature," each of their suggestions in fact second-guesses DC Water's discretionary policy judgments regarding capital budgeting, long-term rehabilitation sequencing, and the allocation of infrastructure resources dedicated to the rehabilitation of the Potomac Interceptor.

For the foregoing reasons, this suit should be barred by governmental immunity and dismissed.

## C. The Four Counts Fail to State Any Claim Upon Which Relief Can be Granted

As a threshold issue and contrary to Plaintiffs' assertion[26], Maryland's *lex loci delicti* choice of law rule for tort actions applies in this case, meaning the law of the places of the wrongs controls. *See Doctor's Weight Loss Ctrs., Inc. v. Blackston*, 487 Md. 476, 492-93 (Md. 2024). "[W]hen the facts concern multiple states, Maryland 'appl[ies] the [substantive] law of the [s]tate where the injury—the last event required to constitute the tort—occurred.'" *Id.* at 493 (quoting

---

[26] Plaintiffs aver that Maryland law applies to all Plaintiffs by proposing a *lex loci delicti* exception that swallows the rule and because their own tort action is preempted for choice of law purposes by the Clean Water Act . Compl. at pp. 9-11, ⁋⁋ 26-28.

*Lab. Corp. of Am. v. Hood*, 395 Md. 608, 615 (Md. 2006)). Under this rule, the law is chosen based on the location of an injury rather than the location of the origin of an injury. Restatement (First) Conflict of Law, § 377, cmt. a, note 3 ("When harm is caused to land or chattels, the place of wrong is the place where the force takes effect on the thing. Illustrations: [. . .] A, in state X, throws out noxious fumes from a chimney which destroy the grass of B in state Y. The place of the wrong is in Y."). Assuming momentarily that Plaintiffs pled any cognizable wrongs, they are correct that Maryland law applies to Miller's and the Fishing Plaintiffs' claims. However, any wrongs to the Yacht Plaintiffs were suffered within the District of Columbia and any wrongs to Prince William Marina were suffered in Virginia. Therefore, District of Columbia tort law applies to the Yacht Plaintiffs' claims and Virginia tort law applies to Prince William Marina.

### 1. Negligence

Plaintiffs cannot prove negligence because (1) DC Water did not owe a duty to any Plaintiff because any alleged injuries to Plaintiffs were not reasonably foreseeable, (2) even if there was a duty, the complaint does not properly allege a breach of a standard of care but instead discusses generalities and what Plaintiffs allege as best practices or a wish list, (3) the Fishing Plaintiffs and Prince William Marina were owed no duty and cannot substantiate negligence claims for purely economic losses, and (4) under the public duty doctrine, DC Water owed no duty to the Yacht Plaintiffs.

Under Maryland law, "[i]n the context of a negligence action, [. . .] a sufficient pleading must 'allege, with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach.'" *Scott v. Jenkins*, 345 Md. 21, 28 (Md. 1997) (quoting *Read Drug and Chemical Co. v. Colwill Constr. Co.*, 250 Md. 406, 412, 243 (Md. 1967) (emphasis in original);

19

*cf. Kellermann v. McDonough*, 278 Va. 478, 487 (Va. 2009) (restating Virginia's same negligence elements); *Freyberg v. DCO 2400 14th St., LLC*, 304 A.3d 971, 976 (D.C. 2023) (similarly setting forth negligence elements under District of Columbia law).

No duty is generally owed absent "foreseeability of harm." *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 77 (Md. 1994) (citation omitted); *cf. Norfolk Shipbuilding & Drydock Co. v. Scovel*, 240 Va. 472, 474-76 (Va. 1990) (explaining "foreseeability" under Virginia negligence law); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (similarly discussing "foreseeability" and "reasonably foreseeable" risk under District of Columbia law).

An alleged breach must be reviewed with the appropriate reasonably-prudent-person or ordinary standard of care. *Valentine v. On Target, Inc.*, 353 Md. 544, 550 (Md. 1999) ("'in negligence cases, the duty is always the same -- to conform to the legal standard of reasonable conduct in the light of the apparent risk'") (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30, at 356 (5th ed. 1984); *cf. Griffin v. Shively*, 227 Va. 317, 321 (Va. 1984) (explaining simple negligence standard of care in Virginia); *Hedgepeth*, 22 A.3d at 794 (similarly expressing District of Columbia's reasonably prudent person standard and noting, "[t]here is only a minimal duty, if any, owed to a party who is at arms' length.").

### a. Plaintiffs Have Not Pled Duty or Breach (All Plaintiffs—Maryland, District of Columbia, and Virginia Law)

For all Plaintiffs, it is doubtful that DC Water owed any duty. The fact that Plaintiffs' remote and speculative injuries allegedly occurred either *upstream* of the Potomac Interceptor collapse or between 10 and 72.5 miles downstream of it raises serious questions about whether any harm to Plaintiffs, to the extent actually incurred, was foreseeable.

20

Even if any duty was owed, Plaintiffs' attempt to transform negligence into a strict liability standard by circularly suggesting that DC Water should have prevented the Potomac Interceptor collapse and any bacteria from entering the Potomac River.

Plaintiffs' strawman reasonably prudent standard of care dismisses the scope of the Project and the known acts DC Water took for the Potomac Interceptor rehabilitation to focus only on what more DC Water allegedly could have done. Plaintiffs' allegations of DC Water's failures to act as a reasonably prudent person, or utility, may be distilled into a series of additional "safeguards" Plaintiffs feel DC Water should have adopted, including: (1) additional inspection or monitoring, (2) the adoption of additional interim safeguards, and (3) the adoption of additional emergency response plans and containment or contingency measures. Compl. at p. 21-22, ¶ 69.

DC Water's actions through the Project were reasonably prudent on the face of the Complaint. DC Water committed to funding the Project with $625,000,000. DC Water is prioritizing its rehabilitation resources and efforts to vulnerable sections of the 54-mile Potomac Interceptor based on available information such as the outcomes and conclusions of the 2011–2015 comprehensive Potomac Interceptor study and other subsequent information such as the later PI inspections, which Plaintiffs have conceded.

> **b. Fishing Plaintiffs' and Marina's Economic Damages are Incognizable (Fishing Plaintiffs—Maryland law; Prince William Marina—Virginia Law) and Yacht Plaintiffs are Owed No Duty Under the District of Columbia's Public Duty Doctrine (Yacht Plaintiffs—District of Columbia Law)**

In addition to the broader duty and breach pleading deficiencies for all Plaintiffs, the Fishing Plaintiffs and Prince William Marina were owed no duty under the economic loss doctrine and the Yacht Plaintiffs were owed no duty under the public duty doctrine. In the vein of foreseeability, Maryland and Virginia have steadfastly limited duty under their economic loss doctrine jurisprudence just as the District of Columbia has under its public duty doctrine.

21

Under Maryland's and Virginia's economic loss doctrines, respectively applicable to the Fishing Plaintiffs and Prince William Marina, these Plaintiffs cannot bring negligence claims because they seek purely economic damages. *See* Compl. at pp. 5-7, ¶¶ 16,17, 20. "The economic loss doctrine represents a judicial refusal to extend tort liability to negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611 (Md. 2017) (citations omitted); *cf. Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 422-25 (Va. 1988) (explaining Virginia's economic loss rule bars recovery under negligence for economic losses where there was no privity and analyzing Va. Code § 8.01-223, which derogates privity defense when there is injury to person or property); *see also Arch Ins. Co v. Costello Const. of Md., Inc*, 2020 U.S. Dist. LEXIS 40655 at *7-8 (D. Md. 2020) (clarifying application of the economic loss doctrine); *see also Philip Morris, Inc. v. Emerson*, 235 Va. 380, (Va. 1988) (declining to depart from "Restatement (Second) of Torts § 766 (1977) that '[o]ne is not liable to another for pecuniary harm not derived from physical harm to the other, if that harm results from the actor's negligently . . . interfering with the other's performance of his contract . . .'"). In this case, there was no duty to prevent these economic losses because these Plaintiffs have not pled privity, physical injury, risk of physical injury, or injury to property.

Under the District of Columbia public duty doctrine applicable to the Yacht Plaintiffs, "[t]he District is subject to liability for injuries arising from the negligence of its employees only if the duty owed to the plaintiff was a special duty to that person as an individual or as a member of a class of persons to whom a special duty is owed; the District cannot be sued if the duty it owed was a general duty to the public-at-large." *Powell*, 602 A.2d at 1127 (citing *Klahr v. District of Columbia*, 576 A.2d 718, 719 (D.C. 1990)). The District of Columbia codified the public duty

22

doctrine at D.C. Code § 5-401.02. *See Hoodbhoy v. Dist. of Columbia*, 282 A.3d 1092, 1097-98 (D.C. 2022) (discussing impact of D.C. Code § 5-401.02).

To determine whether a duty is owed to an individual, "a special relationship can be established, in the absence of direct or continuing contact [between a governmental agency and individual], via a statute or regulation that 'describe[s] a special duty to a particular class of individuals.'" *Hoodbhoy*, 282 A.3d at 1097 (quoting *Turner v. District of Columbia*, 532 A.2d 662, 667 (D.C. 1987)).

D.C. courts have held a special duty is lacking in a wide array of circumstances. In *Hoodbhoy*, the D.C. Court of Appeals rejected "a narrow exception to the public duty doctrine where the government negligently exposes foreseeable members of the public to harm by an inmate or patient [it] has reason to know is dangerous." *Id*. at 1099. There was no special relationship between the District of Columbia and a landowner when the District negligently failed to require an adjacent landowner to obtain a demolition permit and caused the landowner's house to collapse. *District of Columbia v. Forsman*, 580 A.2d 1314, 13119 (D.C. 1990). Nor was there any special relationship for wrongful death claims when a club burned that the District knew to have building and fire code violations but allowed to remain open. *Platt v. District of Columbia*, 467 A.2d 149, 152 (D.C. 1983). The District also did not have a special relationship to property owners with fire damage after the District reduced water pressure. *Nealon*, 669 A.2d at 691-93. An example of a subset of the general public or class that is protected by law and owed a special duty, are abused children who are protected by the Child Abuse Protection Act. *Turner*, 532 A.2d at 675.

The Yacht Plaintiffs do not allege any direct or continuing contact with DC Water. The only applicable laws or regulations at issue would be addressed by a Clean Water Act enforcement

action. *See, e.g.*, ECF Nos. 23-5, 23-6. The Yacht Plaintiffs cannot establish that their boating or other alleged interests are unique from the public at large. DC Water did not owe the Yacht Plaintiffs any special duty, so their negligence count fails to state a claim for which relief may be granted and should be dismissed based, independently, on the public duty doctrine.

Plaintiffs each fail to state a claim for negligence, so that count should be dismissed.

### 2. Private Nuisance (Miller—Maryland Law)

Miller has not pled a cognizable claim for private nuisance because (1) Miller failed to provide facts, such as his address, to allow the Court or DC Water to even evaluate plausibility and (2) any of his alleged temporary injuries would not be of the magnitude to establish "substantial and unreasonable interference" or a "continuance or recurrence" of interference. Private nuisance is "a tort involving a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Express Scripts, Inc. v. Anne Arundel Cnty*, 493 Md. 329, 394 (Md. 2026) (citing *Rosenblatt*, 335 Md. 58). Not every interference with a plaintiff's use and enjoyment of land, however, will support a cause of action for nuisance. To succeed on a private nuisance claim "requires evidence of an *unreasonable and substantial* interference with a plaintiff's use and enjoyment of his or her property." *Id.* at 376 (citations omitted) (emphasis added). An alleged injury to use and enjoyment of land "must be of such a nature as to diminish *materially* the value of the property *and* to *seriously* interfere with the ordinary comfort and enjoyment of it." *Id.* (citations omitted) (emphasis added). In Maryland, "'[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and use for a normal purpose.'" *Echard v. Kraft*, 159 Md. App. 110, 118-19 (Md. Ct. Spec. App. 2004) (quoting Restatement (Second) of Torts, § 821F).

To establish liability for a private nuisance, "there must be a 'continuousness or recurrence of the things, facts, or acts, which constitute the nuisance,'" as a single occurrence does not constitute a nuisance. *Id.* at 119 (also observing that "[t]he authorities appear to be in agreement that 'one act of misconduct, though it causes discomfiture or inconvenience to others in the use and enjoyment of property, is not actionable as a nuisance.'" (citations omitted)); *see also Maryland, Dep't of Natural Resources v. Amerada Hess Corp.*, 350 F. Supp. 1060, 1068-69 (D. Md. 1972) (requiring recurrence or continuance of an invasion to sustain a nuisance action).

Miller did not plead a continuous or recurrent invasion or other substantial and unreasonable inference that would establish a private nuisance. First, Miller's alleged interference with the use and enjoyment of his land are unreasonable as alleged because the complaint provides insufficient information to sufficiently determine whether the collapse plausibly invaded or interfered with his land. Compl. at p. 31, ¶ 99. As discussed in Section IV.A herein, Miller asserts his "riparian"[27] land is in "close proximity" to the collapse site but on the facts alleged his land appears to be upstream of the collapse site and not bordering the Potomac River. Compare *Id.*; Compl. at p. 5, ¶ 15 ("Miller is a citizen of the State of Maryland, residing in Bethesda, Maryland, at a property located approximately 200 yards from the Potomac River and in close proximity to the discharge site") *with* Exhibits 2A, 2B. As a result, Miller has not plausibly alleged that sewage or any other impact of the collapse could have invaded or interfered with his use and enjoyment of his upstream non-riparian land.

Second, Miller has failed to adequately allege that the loss of the use and enjoyment of his land was substantial. All the alleged interferences with Miller's use and enjoyment of his property stem from a single event, the PI collapse and DC Water's remediation of the impacts of the

---

[27] "Riparian" means "of, relating to, or located on the bank of a river or stream . . . ." *Riparian*, Black's Law Dictionary (11th ed. 2019).

collapse. As such, any alleged invasion to Miller's property stems from a single occurrence, not continuous or recurrent acts or occurrences. Likewise, to the extent Miller can allege the loss of the use and enjoyment of the Potomac River (again, he does not allege that his property borders the Potomac and he does not own the Potomac), his access to and recreation on the Potomac was only temporarily impacted. Further, Miller's alleged injuries are based on temporary odor concerns at an undisclosed address in Bethesda, which is apparently some distance from the Cabin John site of the collapse and Miller has already returned with his family to their home. These odor concerns were substantially alleviated before the first amended complaint was filed and certainly cannot constitute continuous or recurrent interference with Miller's undisclosed land.

For the foregoing reasons, Count II should be dismissed.

3.  **Public Nuisance (All Plaintiffs—Maryland, District of Columbia, and Virginia Law)**

In Maryland, a public nuisance "involves an unreasonable interference with the rights of the community at large and was historically punishable as a crime." *Express Scripts*, 493 Md. at 376 (citing *Rosenblatt*, 335 Md. at 79 n.8; (Md. 1994); *Burley v. Annapolis*, 182 Md. 307 (Md. 1943)). The Maryland Supreme Court has explained that a "plaintiff injured by a nuisance may seek damages or injunctive relief if the plaintiff suffers an injury that is different in kind from that suffered by other members of the public." *Id.* at 376 (citing *Cook v. Normac Corp.*, 176 Md. 394, 397 (Md. 1939). Virginia and the District of Columbia maintain similar requirements that a public nuisance claim may only proceed for private parties that can demonstrate their injury is different in kind from that suffered by members of the general public. *See Hinton v. Kroger*, 2019 U.S. Dist. LEXIS 146879 at *6-7 (E.D. Va. 2019); *National Tel. Coop. Ass'n v. Exxon Corp.*, 38 F. Supp. 2d 1, 13 (D.D.C. 1998).

26

Plaintiffs in all jurisdictions have failed to plead any special damages or injuries unique from others who may exercise the same public rights to and on the Potomac River. In other words, Plaintiffs have not alleged any harm outside the alleged harm to public rights, e.g., those the State of Maryland has asserted in its public nuisance claim related to the PI collapse. *See* ECF No. 23-6 at pp. 26-27. Notwithstanding any business or chattel ownership interests, Plaintiffs' alleged harms all stem from common, nonexclusive rights to the Potomac River, such as navigation and recreation. *See* Compl. at pp. 5-7, ¶¶ 15-20. The Fishing Plaintiffs and Prince William Marina's economic losses, similar to the negligence context, fall short of special damages. *See, e.g., Express Scripts, Inc.*, 493 Md. at 394 ("Public nuisance involves an unreasonable interference with the rights of the community at large and was historically punishable as a crime," but a "plaintiff in a private nuisance action may be entitled to injunctive relief or damages if the plaintiff establishes that he or she has suffered an injury that is different in kind from that suffered by members of the public"); *Philip Morris, Inc.*, 235 Va. at 405-07 (holding chemical spill nuisance claim for lost profits incognizable where chemical did not enter business owner-plaintiff's property and that nuisance was not available in the alternative to negligence claim where "the nuisance allegedly was the result of negligent conduct."). The Plaintiffs' alleged injuries are not damages "of a different kind from that suffered by other persons exercising the same public right[s]" to or on the Potomac River and are therefore best "left to be remedied by action by public officials." *See* Restatement (Second) of Torts, § 821C, cmt. b. As a result, none of the limited damages Plaintiffs allege satisfy the special damages requirement for a private party attempting to bring a public nuisance claim.

Count III should accordingly be dismissed.

27

#### 4. Trespass to Land (Miller—Maryland Law)

Miller has not alleged facts allowing an inference that sewage could have plausibly entered his property, at an undisclosed location upstream of the PI collapse, to support a trespass to land claim. In Maryland, "recovery for trespass requires that the defendant must have entered or caused something harmful or noxious to enter onto the plaintiff's land." *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 408 (Md. 2013) (citing *Toy v. Atlantic Gulf & Pacific Co.*, 176 Md. 197, 205-06 (Md. 1939)), *reconsidered in part on other grounds*, 433 Md. 502, 71 (Md. 2013). With regard to odor and other intangible intrusions, Maryland courts have held that "a defendant's act must cause an invasion of the plaintiff's property by some tangible matter" and "intangible intrusions like smoke, odor, light and noise are not typically actionable under a trespass theory." *Schuman v. Greenbelt Homes, Inc.*, 212 Md. App. 451, 475-76 (2013) (citations and internal quotations omitted), *cert. denied*, 435 Md. 269 (2013).

Having failed conveniently to provide his address, Miller baldly asserts that "the PI caused the physical invasion of Plaintiff Miller's . . . land by sewage contaminated water . . . ." Compl. at p. 34, ¶ 111. Crucially, however, Miller never alleges that his land is downgradient or downstream of the sewer collapse site nor how his property could have plausibly been invaded by tangible matter from the PI collapse. As previously noted, Miller alleges that he resided in Bethesda "200 yards from the river" rather than Cabin John. Compl. at pp. 34-35, ¶ 112. Without explaining how sewage could have travelled uphill and upriver, Miller alleges that sewage-contaminated water invaded his property. *Id*. Further, Miller alleges that he has incurred costs testing his well but his own testing has confirmed that his well was not *actually* contaminated with any tangible matter from the PI. *See id*. ("risk of contamination to his private well"). Because the Complaint indicates

28

that Miller's property is somewhere upstream of the spill, it appears to be impossible that the release could have affected his well.

As a result, Miller has failed to plausibly allege facts that his land was or could be invaded by "tangible matter" from the Potomac Interceptor. *See Schuman*, 212 Md. App. at 475-76. Finally, Miller cannot sustain a claim for trespass to real property based on allegations that odors from the PI invaded his property under Maryland law. *Id*.

Count IV of Plaintiffs' Second Amended Complaint should, therefore, be dismissed.

### 5. Trespass to Chattels (Yacht Plaintiffs—District of Columbia Law)

In their trespass to chattels claim, the Yacht Plaintiffs omit the intentional element of that tort from their recitation of law and factual pleading. Compl. at p. 36, ¶¶ 116-120. Restatement (Second) of Torts, § 217, adopted into D.C. law, makes clear that intent is required, meaning negligence is insufficient. Restatement (Second) of Torts, § 217 ("A trespass to a chattel may be committed by *intentionally* (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another.") (emphasis added); *see Greenpeace, Inc. v. Dow Chem. Co.*, 2013 D.C. Super. LEXIS 22, at *27 (Super. Ct. 2013) (citing *Pearson v. Dodd*, 410 F.2d 701, 707 n. 30 (D.C. Cir. 1969) (quoting Restatement (Second) of Torts § 217). Comment c to Restatement section 217 clarifies that "[s]uch an intention is present when an act is done for the purpose of using or otherwise intermeddling with a chattel or with knowledge that such an intermeddling will, to a substantial certainty, result from the act." Restatement (Second) of Torts, § 217, cmt. c. The Yacht Plaintiffs have not, and cannot, plead any *intentional* intermeddling. Therefore, the Complaint's trespass to chattels count fails to state a claim upon which the Court may grant relief and should be dismissed.

## CONCLUSION

For the aforementioned reasons, the Motion to Dismiss should be granted pursuant to Rule 12(b)(1) for lack of standing or governmental immunity and/or pursuant to Rule 12(b)(6) for failure to state a claim, or for all of these three grounds.

Dated: July 13, 2026                                    Respectfully Submitted,


__/S/_____
F. Paul Calamita (Federal Bar # 25022)
M. Rosewin Sweeney (Federal Bar # 03334)
Ross Phillips (Admitted Pro Hac Vice)